872 A.2d 1139

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**John Wesley BROWN, Appellant.**

Supreme Court of Pennsylvania.

Submitted Feb. 11, 2002.

Decided April 29, 2005.

Concurring Opinion Filed July 6, 2005.

462

J. Michael Farrell, Esq., Philadelphia, for John Wesley Brown.

Hugh J. Burns, Esq., Regina Marie Oberholzer, Esq., Amy Zapp, Esq., Philadelphia, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Chief Justice CAPPY.

Appellant, John Wesley Brown, appeals from the Order of the Court of Common Pleas of Philadelphia County, denying his petition for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. For the reasons that follow, we affirm the order of the PCRA court.

The underlying facts of the case, as set forth by this Court on direct appeal, are as follows:

On June 10, 1990, appellant and his father, Wesley Brown, who was then seventy-seven years old, were together in their home in Philadelphia. A quarrel between the two occurred over appellant's use of his father's car for "hacking," that is, an unlicensed taxi service. Appellant shot his father four times with a .38 caliber pistol and left him to bleed to death in their home. A neighbor who heard the shots called the victim's granddaughter; she in turn called her grandfather. Appellant answered the phone and told his niece that her grandfather was outdoors. Appellant placed a .38 caliber revolver next to his father's body and took $400 from his father's wallet, then drove off in his father's car. He disposed of the murder weapon by throwing it out the car window in Maryland en route to Georgia.

Two days later appellant was stopped at a road check in Georgia; a computer check of appellant's driver's license disclosed that the license was expired, that the car was stolen, and that appellant was wanted in Pennsylvania for murder. Appellant admitted shooting his father, but claimed it was done in self-defense after his father pointed a .357 magnum pistol at him.

Following appellant's trial, the jury found him guilty of murder of the first degree, robbery, and possessing an instrument of crime. Following the penalty phase of the trial, the jury found that an aggravating circumstance existed, to-wit, that appellant had been convicted of a prior voluntary manslaughter; the jury also found three mitigating circumstances, namely, that appellant had no significant history of prior criminal convictions, that he acted under extreme mental or emotional disturbance, and that he had some other evidence of mitigation. In balancing the statutory factors, the jury concluded that the aggravating circumstance outweighed the mitigating circumstances, and unanimously reached a verdict of death.

*Commonwealth v. Brown,* 538 Pa. 410, 416–17, 648 A.2d 1177, 1180 (1994) (footnotes omitted).

Following his conviction, Appellant obtained new counsel and filed a direct appeal to this Court, raising numerous issues of trial court error as well as claims of counsel ineffectiveness. Our Court affirmed the judgment of sentence on October 6, 1994. *Id.* On January 15, 1997, Appellant filed a *pro se* PCRA petition. Current counsel was appointed to represent Appellant, and an amended petition was filed on April 2, 1998. Thereafter, Appellant filed supplemental pleadings, which he captioned as either replies to the Commonwealth's motions to dismiss or supplemental amended petitions. These pleadings were filed on August 26, 1998, October 9, 1998, April 1, 1998, and June 16, 1999. The Commonwealth responded to each pleading by filing motions to dismiss. On February 2, 1999, May 17, 1999 and December 22, 1999, the trial court conducted hearings for the sole purpose of determining whether an evidentiary hearing was warranted. After Appellant and the Commonwealth argued their legal positions, the trial court took the matter under advisement. On April 12, 2000, the trial court orally granted the Commonwealth's motion to dismiss the PCRA petition, and on April 13, 2000, the court filed its order and opinion in support thereof.

In this appeal from the PCRA court's dismissal of his petition, Appellant raises twenty-three issues, and numerous

sub-issues, for our review. Initially, we note that this Court has jurisdiction over Appellant's petition because we directly review the denial of post conviction relief in death penalty cases pursuant to 42 Pa.C.S. § 9546(d). In cases where the judgment of sentence was final prior to the 1995 enactment of the timeliness requirement, a first PCRA petition is considered timely if filed within one year of the effective date of the enactment or January 16, 1997. Section 3(1) Act 1995 (Spec.Sess. No. 1), Nov. 17, P.L. 1118, No. 32. Because the instant petition is Appellant's first PCRA petition and it was filed on January 15, 1997, it is considered timely filed.

Prior to addressing the merits of Appellant's issues, we must first entertain the Commonwealth's contention that Appellant's claims are not cognizable under the PCRA. The Commonwealth argues that Appellant erroneously raises allegations of error as if he were presenting the claims on direct appeal and ignores his burden of proof under the PCRA. It further argues that Appellant's boilerplate assertions of all prior counsel's ineffectiveness, without providing the required legal analysis for demonstrating each layer of counsel's supposed ineffectiveness, is insufficient to avoid waiver of the underlying claims. Upon careful consideration of the manner in which Appellant's claims have been presented, and in light of the strict requirements of the PCRA and this Court's case law interpreting such requirements, we agree with the Commonwealth that several of Appellant's claims are not reviewable. Each issue, however, must be examined independently to determine whether review of the merits is required.

In order to be eligible for relief, a PCRA petitioner must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated defects found in 42 Pa.C.S. § 9543(a)(2), and that the allegation of error has not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). A claim is previously litigated under the PCRA if the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue. 42 Pa.C.S. § 9544(a)(2). An allegation is deemed waived "if the petitioner could have

raised it but failed to do so before trial, at trial, on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b). We further note that, pursuant to *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998), the relaxed waiver rule is no longer applicable to PCRA appeals and therefore any claims that have been waived by Appellant are beyond the power of this Court to review under the terms of the PCRA.

With these principles in mind, we turn to Appellant's allegations of error. For purposes of our review, we do not examine these issues in the order raised by Appellant in his brief. Rather, we begin with those issues that we find to be "previously litigated" under the PCRA because they were reviewed by this Court on direct appeal. We agree with the PCRA court that Appellant's challenge to the evidence supporting the aggravating circumstance of a prior conviction of voluntary manslaughter, set forth at 42 Pa.C.S. § 9711(d)(12) (Argument I), was raised on direct appeal and was rejected by this Court. To be precise, Appellant challenged the aggravator on direct appeal by arguing that the prosecutor elicited testimony from a detective establishing that Appellant had been "charged" in a prior homicide. Appellant argued that evidence of a charge was not evidence of a "conviction." Our Court rejected this claim as frivolous, finding that the detective testified that Appellant had been charged with voluntary manslaughter *and* that he pled guilty to such charge. *Commonwealth v. Brown*, 538 Pa. 410, 426–28, 648 A.2d at 1185. Appellant also argued on direct appeal that the prosecutor erred in the manner in which she presented the evidence of the aggravating circumstance, *i.e.*, by eliciting from the detective a long recitation of the facts of the prior manslaughter case. Our Court likewise rejected this claim on the merits. *Id.* at 428–30, 648 A.2d at 1186. Such claim, raised again in the instant appeal as one challenging the detective's testimony as hearsay, is not reviewable. Appellant cannot obtain post conviction review of claims previously litigated on appeal by presenting new theories of relief to support the previously

litigated claims. *Commonwealth v. Stokes*, 576 Pa. 299, 304–05, 839 A.2d 226, 229 (2003).

In his current appeal, Appellant additionally argues that the sole aggravating circumstance found is legally inapplicable to his case. To satisfy section 9711(d)(12), the Commonwealth must demonstrate that "[t]he defendant has been convicted of voluntary manslaughter, as defined in 18 Pa.C.S. § 2503 (relating to voluntary manslaughter), or a substantially equivalent crime in any other jurisdiction, committed either before or at the time of the offense at issue." 42 Pa.C.S. 9711(d)(12). Appellant maintains that because he was convicted of voluntary manslaughter prior to 1967, when 18 Pa.C.S. § 2503 was codified, the aggravator does not apply. As this is yet another challenge to the sole aggravator, which was upheld on direct appeal, this claim arguably has been previously litigated. To the extent that this specific issue was not previously litigated on direct appeal, the issue is waived due to Appellant's failure to raise it on direct appeal. 42 Pa.C.S. § 9544(b).

The next claim that was previously litigated on direct appeal alleges that Appellant is entitled to relief because he was forced to wear shackles during his trial and because there was a large police presence in the courtroom (Argument VII). On direct appeal, we held that the trial court did not abuse its discretion in permitting Appellant to be shackled in the courtroom because Appellant offered no evidence that any juror saw the shackles or was influenced by the observation. 648 A.2d at 1189. The latter part of Appellant's claim, that he is entitled to relief as a result of the large police presence in the courtroom, was not raised on direct appeal, and is therefore waived. 42 Pa.C.S. § 9544(b).

We also find waived several other issues that Appellant failed to raise on direct appeal. Appellant's claims that the trial court gave an improper self-defense charge to the jury (Argument XII) and that his conviction and death sentence were the result of racial discrimination (Argument XVI) were never raised on direct appeal to this Court and are therefore not reviewable. Also waived are the following claims relating to jury selection: that prospective jurors were improperly dismissed for cause and were not life-qualified (Argument

XIII), that the trial court improperly restricted Appellant's right to *voir dire* prospective jurors (Argument XIV), and that the prosecution exercised racially discriminatory peremptory challenges (Argument XV). Additionally, we find waived the claims that the trial court erred in its reasonable doubt instructions (Argument XVII), and that the trial court failed to provide a "life without parole" instruction (Argument XVIII). These issues were available to Appellant on direct appeal when he was represented by new counsel. As he failed to raise them on appeal from the judgment of sentence, they are waived. 42 Pa.C.S. § 9544(b).[1]

Additionally, we find waived Appellant's claim that Justice Castille's participation in Appellant's direct appeal deprived him of his right to an impartial appellate tribunal because Justice Castille was the District Attorney at the time Appellant was criminally charged (Argument XIX). This claim was not presented in Appellant's PCRA petition and therefore is not reviewable.[2]

We turn next to Appellant's claims of ineffective assistance of counsel. In *Commonwealth v. McGill*, 574 Pa. 574, 583–94, 832 A.2d 1014, 1020–26 (2003), this Court recently clarified the procedure to be followed in preserving and proving a PCRA claim challenging the effectiveness of counsel other than immediate appellate counsel. In the context of this case, *McGill*, explains that "in order for a petitioner to properly raise and prevail on a layered ineffectiveness claim, suffi-

---

1. In Argument XX, Appellant attempts to overcome waiver of the aforementioned claims by baldly asserting the ineffectiveness of all prior counsel without setting forth the three prong standard for ineffectiveness established in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987), as it relates to the performance of counsel at *any* level of representation. Such an undeveloped claim, based upon a boilerplate assertion of all prior counsel's ineffectiveness, cannot convert a claim of trial court error into one of counsel's ineffectiveness. *See Commonwealth v. Bracey*, 568 Pa. 264, 273 n. 4, 795 A.2d 935, 940 n. 4 (2001) (The mere tacking on of a sentence stating that all prior counsel were ineffective for failing to raise underlying claims of error does not satisfy Appellant's burden of establishing that he is entitled to post conviction relief on ineffective assistance of counsel claim.).

2. We further note that Appellant did not seek Justice Castille's recusal on direct appeal and has not sought recusal in the instant matter.

cient to warrant relief if meritorious, he must **plead, present, and prove**" the ineffectiveness of direct appellate counsel, which necessarily relates back to the actions of trial counsel. *Id.* at 1022 (emphasis in original). Therefore, to preserve a claim that direct appellate counsel was ineffective, the petitioner must: (1) plead, in his PCRA petition, that direct appellate counsel was ineffective for failing to allege that trial counsel was ineffective; and (2) present argument and develop all three prongs of the *Pierce* test regarding the ineffectiveness of direct appellate counsel. *Id.*

As we explained in *McGill* and expounded upon in *Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651 (2003), review of the issue of ineffectiveness of trial counsel is merely a component of the claim at issue—that challenging the effectiveness of appellate counsel. Therefore, to demonstrate that a "layered" claim of appellate counsel's ineffectiveness has arguable merit, the petitioner must develop all three prongs of the *Pierce* test as to the ineffectiveness of trial counsel. *McGill,* 574 Pa. at 586–88, 832 A.2d at 1022; *Rush,* 576 Pa. at 11–12, 838 A.2d at 656.[3] Stated differently, if the petitioner fails to develop any of the three *Pierce* prongs regarding the underlying issue of trial counsel ineffectiveness, he or she will have failed to establish the arguable merit prong of the claim of appellate counsel's ineffectiveness. *McGill,* 574 Pa. at 588–90, 832 A.2d at 1023; *Rush,* 576 Pa. at 11–12, 838 A.2d at 656. Only when the petitioner has adequately pled and presented the ineffectiveness of trial counsel pursuant to the *Pierce* test will this Court proceed to review the *layered* claim to determine whether he or she has proven appellate counsel's ineffectiveness. *McGill,* 574 Pa. at 588–90, 832 A.2d at 1023.

Pursuant to the mandate of *McGill,* where the petitioner has pled, presented, and proved the underlying issue of trial counsel ineffectiveness, a remand may be necessary to

---

3. It is well-established that the *Pierce* test requires the PCRA petitioner to demonstrate that: (1) the underlying claim has substantive merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and, (3) the petitioner suffered prejudice as a result of that counsel's deficient performance. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

allow the petitioner an opportunity to correct any errors with regard to the pleading and presentation of his or her claim of appellate counsel ineffectiveness. *McGill,* 574 Pa. at 590–91, 832 A.2d at 1024. Where the petitioner fails to plead and prove all three prongs of the *Pierce* test regarding the underlying issue of trial counsel's ineffectiveness, however, a remand is unnecessary because the petitioner cannot establish the arguable merit prong of the *Pierce* test regarding the ineffectiveness of appellate counsel. *Id.; Rush,* 576 Pa. at 11–12, 838 A.2d at 656.

Therefore, as a threshold matter, we must determine whether Appellant has properly preserved his remaining claims of appellate counsel ineffectiveness as required by *McGill* and *Rush.* We find that Appellant properly pled these layered ineffectiveness claims in a manner sufficient to warrant merits review. In his Brief to this Court, Appellant also adequately addressed the *Pierce* standard regarding the ineffectiveness of trial counsel. However, as detailed below, Appellant has failed to prove all three prongs of the *Pierce* test as it relates to each underlying issue of trial counsel's ineffectiveness. Having failed to establish trial counsel's ineffectiveness for each issue raised on appeal, Appellant cannot satisfy the arguable merit prong of the *Pierce* test regarding the ineffectiveness of appellate counsel. In light of this determination, a remand is not warranted here.[4,5]

4. We recognize that the PCRA court neither identified Appellant's failure to develop his layered claims of appellate counsel ineffectiveness as a ground for dismissal, nor did it offer him an opportunity to amend his petition to develop those claims. Instead, the court examined the merits of Appellant's underlying allegations of trial counsel's ineffectiveness and found them to be without merit. Because we agree with this assessment, a remand is not required.

5. We further note that in his reply brief, Appellant attempts to remedy some of the deficiencies in his initial brief and to comply with the various capital PCRA cases that were decided *after* his initial brief had been filed. Appellant attaches to his reply brief a declaration of appellate counsel, wherein counsel states, *inter alia,* that he had no tactical reason for omitting the claims raised in the PCRA petition and that it was not within his normal practice to present non-record based claims on direct appeal.

The Commonwealth has filed an application for leave to file a post-submission motion to strike Appellant's reply brief or permit response. Therein, it contends that Appellant's reply brief should be stricken for

Pursuant to *McGill* and *Rush*, the first claim of appellate counsel ineffectiveness involves the issue of whether trial counsel was ineffective for failing to procure the decedent's (Appellant's father's) criminal history (Argument II). Appellant also argues that appellate counsel was ineffective for not challenging trial counsel's failure to raise a *Brady*[6] violation when the Commonwealth failed to disclose the decedent's criminal history to defense counsel.

In examining these claims of appellate counsel ineffectiveness, we must determine whether Appellant satisfied the three prongs of *Pierce* as to trial counsel's performance. We find that he did not. It is undisputed that the Commonwealth provided the defense with the decedent's criminal record dating back to 1973, which included a 1973 conviction for violating the Uniform Firearms Act, and two convictions in 1973 and 1974 for driving under the influence of alcohol.

Appellant argues, however, that the Commonwealth failed to disclose the decedent's 1930 Ohio conviction for robbery, his 1946 conviction for carrying a concealed deadly weapon, his 1953 conviction for a violation of the Uniform Firearms Act, and several drunk driving convictions from the 1950's and

noncompliance with Pa.R.A.P. 2113(a) because it does not address any new matters raised in the Commonwealth's brief. Appellant has filed an answer to the Commonwealth's application, wherein he opposes the relief requested by the Commonwealth.

We agree with the Commonwealth that an appellant is prohibited from raising new issues or remedying an original brief's deficient discussion in a reply brief. *See* Pa.R.A.P. 2113(a); *Commonwealth v. Fahy*, 558 Pa. 313, 322 n. 8, 737 A.2d 214, 219 n. 8 (1999). However, under circumstances similar to that present here, this Court has considered such arguments made in an appellant's reply brief in a capital PCRA case. *See Commonwealth v. Bracey*, 568 Pa. 274 n. 5, 795 A.2d at 941 n. 5 (Because the appeal necessitated a discussion of the applicability of the relaxed waiver doctrine to PCRA capital appeals and because the Commonwealth filed a motion to respond to the appellant's reply brief and provided such a response, we considered the "new" arguments raised in the reply brief.). Accordingly, we shall consider the arguments set forth in the reply brief and deny the Commonwealth's request to strike the same. As noted *infra*, however, because we find no merit to Appellant's claims of trial counsel ineffectiveness, his assertions regarding appellate counsel's performance do not entitle him to relief.

6. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

1960's. Appellant contends that these convictions would have supported his claim of self-defense. In support of this allegation, Appellant relies upon a declaration of trial counsel, wherein counsel states that, had he been provided a complete criminal history of the victim, he would have investigated the background of the prior offenses and would have presented this material to the jury in support of his theory of self-defense and also as mitigation evidence in the penalty phase. Declaration of Daniel Greene, Appendix of Exhibits to Initial Brief of Appellant, Exhibit 5.[7]

The Commonwealth persuasively argues that it has no obligation to provide a defendant with his victim's criminal history, particularly where, as here, that record is equally accessible to the defense and the victim is the defendant's father. *See Commonwealth v. Spotz,* 562 Pa. 498, 525–27, 756 A.2d 1139, 1154 (2000) (stating that there is no *Brady* violation where the prosecutor failed to turn over evidence readily obtainable by, and known to, defendant). Moreover, because the convictions are alleged to be relevant only to the self-defense claim, Appellant himself would have had to have knowledge of them. If he did not, then the previous convictions would have no bearing on his self-defense claim. As there was no *Brady* violation, there was no basis for trial counsel to raise such issue. Accordingly, Appellant has failed to satisfy the arguable merit prong of the *Pierce* test as to trial counsel's ineffectiveness and, therefore, the claim of appellate counsel ineffectiveness fails.

7. Similar to his other exhibits, Appellant refers to Exhibit 5 as the "Declaration/Affidavit of Daniel Greene." Appellant's exhibits, however, are not properly characterized as "affidavits" because they have not been sworn to by the declarant before an officer authorized to administer oaths. See 1 Pa.C.S. § 1991 ("Affidavit" is defined as "[a] statement in writing of a fact or facts signed by the party making it, sworn to or affirmed before an officer authorized by the laws of this Commonwealth to take acknowledgments of deeds, or authorized to administer oaths, or before the particular officer or individual designated by law as the one before whom it is to or may be taken, and officially certified to in the case of an officer under his seal of office.") However, as noted *infra,* even assuming the truth of the declarations, Appellant's claim of ineffective assistance of counsel fails.

■ The related claim of appellate counsel ineffectiveness for not challenging trial counsel's failure to discover the decedent's criminal history on his own likewise fails. The remoteness in time of the convictions and the fact that the jury was made aware of the victim's 1973 violation of the Uniform Firearms Act, dispel any claim of prejudice. Having failed to satisfy the *Pierce* test as to trial counsel's performance, his claim of appellate counsel ineffectiveness is unsupportable.

■ The next claim of appellate counsel ineffectiveness encompasses the issue of whether trial counsel was ineffective for failing to investigate, develop, and present evidence that would have supported Appellant's theory of self-defense (Argument III). Specifically, Appellant argues that trial counsel should have presented psychiatric evidence establishing that he suffered from mental and cognitive impairments, including bipolar disorder and organic brain damage, as well as evidence that he was threatened and abused by his father. He argues that such evidence should have been presented to support a theory of voluntary manslaughter, either by demonstrating an imperfect self-defense claim or a provocation and passion theory. He relies on trial counsel's declaration, wherein counsel states that had he known of Appellant's alleged mental and cognitive impairments, he would have presented them to the jury. Declaration of Daniel Greene at 11, Appendix of Exhibits to Initial Brief of Appellant, Exhibit 6.

We find that there is no arguable merit to the issue of trial counsel's ineffectiveness because the record at the time of trial did not reveal evidence of mental illness or abuse that would have prompted trial counsel to conduct a further investigation in that regard. In fact, the record established the contrary. In his sworn statement to the police, Appellant was specifically asked whether he had ever been treated for mental health problems. (N.T. 7/18/91, 748). Appellant responded "no." *Id.* Moreover, a pre-sentence investigation report prepared by a psychologist who evaluated Appellant on December 10, 1991, indicated that Appellant reported no history of neurological, suicidal, or psychiatric problems. Exhibit B to the Common-

wealth's Motion of December 14, 1999, filed in Philadelphia County Common Pleas Court. The report further indicated that Appellant did not suffer from any major mental illness, but rather was diagnosed with "personality disorder N.O.S. [not otherwise specified], with some dissocial and anti-social features." *Id.* The primary alleged basis for counsel to have suspected that Appellant was mentally ill at the time of trial is Appellant's "obsession with space travel." The record demonstrates, however, that trial counsel did not view such interest as irrational, but rather offered such evidence in mitigation by presenting the fact that he shared his interest in NASA and the space program with his niece and other children in the neighborhood, taking them to conventions, and educating them on the subject. (N.T. 7/17/91, 585; 7/24/91, 1035, 1044).

Additionally, the record indicated that Appellant had not been abused by his father. In his testimony at trial when he was describing the events leading to the shooting, Appellant explained that his father had thrown a garbage can at his car moments prior to the homicide. (N.T. 7/19/91, 842). When asked whether his father had ever done that before, Appellant stated, "me and my dad never had any violence of any kind." *Id.* He went on to state, "My dad had never hit me, not once." *Id.*

Even assuming such abuse and mental illness did exist, Appellant never informed trial counsel of the same, and there was no objective evidence of record that would have prompted counsel to look further into the issues.[8] *See Commonwealth v. Bracey,* 568 Pa. at 279–81, 795 A.2d at 944 (trial counsel not ineffective for failing to present evidence of alleged abuse where neither the defendant nor his family informed counsel of the abuse). In fact, in the same statement to police referenced above, Appellant made a flippant comment that he was sorry for what occurred and that he was "pleading insanity and self-defense." (N.T. 7/18/91, 747). Presumably

8. The 1999 declarations upon which Appellant now relies on to establish his mental illness at the time of trial involve examinations that were conducted years *after* Appellant's trial, and therefore did not exist at the time the penalty phase of the trial was conducted.

recognizing the lack of record evidence establishing such defense, trial counsel filed a pre-trial motion *in limine* seeking to *preclude from evidence* any reference Appellant made regarding insanity. *See* Trial court opinion at 8 and exhibit. Accordingly, trial counsel cannot be deemed ineffective for failing to present mental health evidence to support Appellant's theory of self-defense when there was no such evidence of record. As there is no arguable merit to the issue of trial counsel ineffectiveness, the claim of appellate counsel ineffectiveness fails.

We must next determine whether appellate counsel was ineffective as a result of trial counsel's failure to investigate and prepare for the penalty phase (Argument IV). As in the prior issue, Appellant alleges that trial counsel failed to present significant mitigating evidence of Appellant's major mental illness, traumatic childhood, and organic brain damage. Although Appellant has produced a declaration of trial counsel wherein he admits that he did not conduct an investigation into Appellant's mental illness, traumatic childhood, and organic brain damage, counsel states that he was unaware of Appellant's deficiencies in this regard. As noted, the information available to trial counsel at the time of trial did not alert counsel to further investigate such issues. *See Commonwealth v. Bracey, supra; Commonwealth v. Uderra,* 550 Pa. 389, 398–402, 706 A.2d 334, 339–340 (1998) (holding that trial counsel was not ineffective for declining to present mitigation evidence regarding appellant's psychological problems and drug use when appellant failed to disclose any information about those problems prior to trial). In addition, the nature of the crime—Appellant shooting his father following a heated argument—did not on its face suggest that the perpetrator was mentally ill. As discussed in detail *supra* at 13–14, the record at the time of trial indicated that Appellant did *not* suffer from any mental infirmity and had *not* been abused by his father.

Rather than portray Appellant as mentally disabled, trial counsel portrayed Appellant as a caring friend and neighbor, a proposition consistent with the self-defense theory presented during the guilt phase. The PCRA court succinctly recognized,

All of the witnesses who testified for [Appellant] at the penalty phase portrayed Appellant as a hero (pulled witness from wreckage of auto accident); a counselor of wayward youth; a father-figure; a community leader; and a lover and protector or young children in the neighborhood.

Trial court opinion at 9.

Even assuming that Appellant's claim is of arguable merit and that counsel failed to have a reasonable basis for failing to further investigate mental health and abuse issues in the penalty phase of trial, Appellant has failed to demonstrate that he was prejudiced by counsel's substandard performance. Such a showing has always been a prerequisite to a claim alleging the ineffective assistance of counsel. *See Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to demonstrate prejudice in this context, Appellant must show that there is a reasonable probability that, absent counsel's failure to present the mitigation evidence he currently proffers, he would have been able to prove at least one mitigating circumstance by a preponderance of the evidence and that at least one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s). *See* 42 Pa.C.S. § 9711(c). Here, the jury found the mitigating circumstances that Appellant acted under extreme mental or emotional disturbance and the catchall mitigating circumstance of other evidence of mitigation. These mitigating circumstances relate to the evidence Appellant currently proffers. Moreover, we cannot conclude that there is a reasonable probability that the jury would have afforded any more weight to the mitigating circumstances when Appellant has failed to establish that such evidence of mental illness existed at the time of trial. Thus, Appellant has failed to demonstrate that he was prejudiced by trial counsel's performance during the penalty phase. Accordingly, the issue of trial counsel ineffectiveness fails and renders the claim of appellate counsel's ineffectiveness untenable.[9]

9. Relying on trial counsel's declaration and our recent decision in *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767 (2004), Justice

Appellant's next claim of appellate counsel ineffectiveness involves trial counsel's failure to impeach the misleading testimony of the medical examiner (Argument VI). At trial, Bennett Preston, M.D., the Assistant Medical Examiner for the City of Philadelphia, testified that the victim had been hit by three bullets: two of those bullets entered the victim's left chest and the third entered his upper left outer arm, passed through the arm, reentered the victim's body under his left arm and traveled under the skin, partially exiting through the back. Dr. Preston testified that the path of the bullet that entered the victim's arm was consistent with the victim having his left hand raised in a defensive posture at the time he was shot, thus discounting Appellant's theory that he had acted in self-defense. (N.T. 7/18/91, 758–766).

Appellant argues that Dr. Preston's testimony is scientifically unsound and that trial counsel was ineffective for failing to obtain an expert to rebut it.[10] He relies on two declarations of

Saylor noted in his dissenting opinion that he would remand to the PCRA court for an evidentiary hearing, particularly for disposition of this issue. The instant case, however, is clearly distinguishable from *Malloy*. First, this case is not one in which the PCRA court denied Appellant the opportunity to prove his claims. To the contrary, the PCRA court conducted several hearings solely to determine whether an evidentiary hearing was required. *See* (N.T. 2/2/1999, 5/17/1999, and 12/22/1999). The PCRA court ultimately adopted the Commonwealth's argument that, because it is clear from the record that trial counsel's performance at the penalty stage was objectively reasonable, there is no reason to present testimony of trial counsel's assertion of "self-ineffectiveness." (N.T. 12/22/1999 at 65–66). In its brief to this Court, the Commonwealth characterizes trial counsel's willingness to allege a lack of preparation as a "blatant misrepresentation to this Court" because it is simply not consistent with what actually occurred at trial. Commonwealth's Brief at 24 n. 23.

Second, unlike *Malloy*, substantial evidence of mitigation was presented. In *Malloy*, trial counsel failed to conduct even a cursory review of the appellant's background and offered no affirmative evidence at all for the jury to consider, only a brief argument and a stipulation. *Malloy*, 856 A.2d at 789. Not surprisingly, the jury in *Malloy* found no mitigating circumstances. In contrast, Appellant's trial counsel presented no less than **eight witnesses** during the penalty phase and, as noted, the jury found three mitigating circumstances. Accordingly, unlike trial counsel in *Malloy*, Appellant's counsel did not abrogate his duty to present penalty phase evidence of mitigation.

10. Appellant further contends that the Commonwealth's knowing presentation of Dr. Preston's materially false testimony violates his constitu-

Dimitri Contostavlos, M.D., who opined that it was impossible to tell from a single gunshot wound whether the victim's left arm was raised in a defensive position. Dr. Contostavlos found that one could not determine whether the victim's palm was facing away from the body or whether the victim's left hand was holding a firearm. Declaration of Dr. Dimitri Contostavlos, Appendix of Exhibits to Initial Brief of Appellant, Exhibit 16.

The Commonwealth argues that, contrary to Appellant's contentions, Dr. Preston's opinion was not based upon a "single gunshot wound," but instead on a total of four wounds inflicted by a single bullet. Moreover, it persuasively notes that Dr. Contostavlos' proposition, that the victim's left arm was wounded while it was holding a weapon at Appellant, is belied by Appellant's own testimony. At trial, Appellant testified that his father pointed a gun at him with his *right* hand. (N.T. 7/19/91, 902). Thus, whether the victim's left hand was raised or by his side is irrelevant to the question of whether he was aiming a firearm at Appellant. The Commonwealth further notes that Dr. Contostavlos and Dr. Preston agreed that the bullets passed through the victim's body in a downward direction, which refutes Appellant's trial theory that he dove to the ground and fired up at his father in self-defense. Under these circumstances, we agree with the Commonwealth that trial counsel's failure to secure Dr. Contostavlos to testify at trial did not prejudice Appellant and therefore trial counsel cannot be deemed ineffective. This being the case, Appellant cannot sustain his burden of satisfying the *Pierce* standard as to appellate counsel's ineffectiveness.

Appellant's next claim of appellate counsel ineffectiveness alleges that trial counsel failed to present material guilt phase evidence in support of his theory of self-defense (Argument X). Identical to his claims in Argument III, Appellant argues that trial counsel ignored evidence of the decedent's history of firearm offenses and the abuse that Appellant suffered by the hands of his father. As noted in disposing of Appellant's

tional rights to due process. This claim is frivolous as a difference in medical opinion clearly does not amount to "false testimony."

previous claims of ineffectiveness at 12, *supra*, Appellant did not demonstrate that he made counsel aware of his father's abusive behavior. See *Commonwealth v. Bracey*, 568 Pa. at 279–81, 795 A.2d at 944 (trial counsel not ineffective for failing to present evidence of alleged abuse where neither the defendant nor his family informed counsel of the abuse). Thus, there is no merit to the issue of trial counsel ineffectiveness and the claim of appellate counsel ineffectiveness has not been established.

Within this same claim of ineffectiveness, Appellant further contends that appellate counsel was ineffective due to trial counsel's failure to hire a firearms expert to examine the evidence linking Appellant to the murder weapon. He asserts that he has currently retained such an expert who opined that the police were grossly negligent in failing to have the gun fingerprinted before the fingerprints were destroyed by the blood examination. He also contends that appellate counsel was ineffective as a result of trial counsel's failure to object to testimony that twenty or more shotgun shells were found in Appellant's room when there was no evidence establishing that a shotgun was used in the commission of the instant murder.

To determine the merit of this claim under *McGill* and *Rush*, we again look to whether there is arguable merit to the issue of trial counsel's ineffectiveness for failing to have the firearm fingerprinted. Detective Bittenbender testified at trial that the handgun was supposed to be submitted for fingerprints, but was not because of a mistake made by the police department. (N.T. 7/18/91, 652–53). Because trial counsel had nothing to do with the reason why the gun was not promptly fingerprinted, there is no arguable merit to the issue of trial counsel's ineffectiveness in this regard. Thus, the claim of appellate counsel ineffectiveness cannot prevail.

As to the issue relating to trial counsel's failure to object to testimony that shotgun shells were found in Appellant's bedroom, we find that Appellant has failed to demonstrate the prejudice prong of the *Pierce* standard as it relates to trial counsel's performance. Appellant could not have been prejudiced by such testimony because Appellant himself testi-

fied that he owned several guns, including a blank shotgun, as well as gun-related items. (N.T. 7/19/91, 831–32). Thus, trial counsel cannot be deemed ineffective and the claim of appellate counsel ineffectiveness necessarily fails.

Appellant also argues that appellate counsel was ineffective for failing to raise the issue that trial counsel improperly denigrated his client (Argument XI). Appellant argues that in the closing argument of the penalty phase, his counsel stated the following:

[T]hen my client, John Brown, has to be one of the most evil people that ever graced the threshold of this planet. He has to be rotten and malicious. He has to be the most evil person there ever was.

Appellant's Brief at 62. Appellant contends that trial counsel's denigration of his client emphasized to the ultimate sentencer that he was a bad person.

This claim is belied by the record. Rather than arguing to the jury that Appellant was evil, trial counsel asserted that, if the prosecution's version of the events were true, Appellant would have to be "the most evil person there ever was, but I suggest to you that he is not. He is not that." (N.T. 9/22/92, 925). Trial counsel then explained why the prosecutor's version of the events was not true. The issue of trial counsel ineffectiveness therefore lacks arguable merit and the claim of appellate counsel ineffectiveness fails.

▮ Finally, we examine those claims that were not previously litigated or waived and do not allege the ineffective assistance of counsel. The first claim in this category alleges that Appellant was incompetent to stand trial and therefore his conviction and death sentence are unconstitutional (Argument V). We recognize that Appellant did not challenge his competency at trial or on direct appeal and first asserted the claim in his PCRA petition under the guise of ineffective assistance of trial counsel. In the current appeal, Appellant presents the issue of whether he was "unconstitutionally tried while incompetent." Appellant's Brief at 2, Issue V. As this issue was not raised on direct appeal, we would generally find

it waived. This Court has consistently held, however, that the issue of whether a defendant was competent to stand trial is an exception to the waiver rule in cases on direct appeal. *Commonwealth v. Tyson,* 485 Pa. 344, 402 A.2d 995 (1979); *Commonwealth v. Silo,* 469 Pa. 40, 364 A.2d 893 (1976); *Commonwealth v. Marshall,* 456 Pa. 313, 318 A.2d 724 (1974); *See also Pate v. Robinson,* 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (finding that it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently "waive" his right to have the court determine his capacity to stand trial).

The issue of whether this case law applies with equal force in the PCRA context has recently divided this Court. *See Commonwealth v. Santiago,* 579 Pa. 46, 855 A.2d 682 (2004). In *Santiago,* a plurality of this Court held that the failure to raise on direct appeal a claim that the appellant was incompetent at the time of trial does not constitute a waiver of that claim for purposes of the PCRA. We reaffirm the plurality's position in *Santiago* in the instant appeal.

We begin our analysis with a review of the pertinent statutory language. As noted, Section 9544(b) provides that an issue is waived for purposes of the PCRA "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b). We recognize that Appellant "could have" raised the competency claim on direct review, but we conclude that the General Assembly intended for Section 9544(b) to apply to those claims that are *required to be preserved.* If the nature of the claim involves a right so fundamental to a fair trial that renders it non-waivable, then the claim is not required to be preserved and is not subject to the waiver provision of the PCRA. To hold to the contrary would render the language of the statute absurd and violate a fundamental rule of statutory construction. *See* 1 Pa.C.S. § 1922(1); (stating that it is presumed that the General Assembly does not intend a result that is absurd.); *See also Id.* at § 1922(3) (setting forth that it is presumed that the General Assembly

does not intend to violate the Constitution of the United States or this Commonwealth).

Our Court has similarly ruled in three previous cases. In *Commonwealth v. Fernandez,* 487 Pa. 493, 497 n. 8, 410 A.2d 296, 298 n. 8 (1980), this Court held that the same reasoning for finding an issue of competency non-waivable on direct appeal would preclude a waiver of competency issues under the Post Conviction Hearing Act (PCHA), Act of January 25, 1966, P.L. (1965) 1580, § 1 1180–1 et seq. (Supp.1979 –1980), the predecessor to the PCRA, when the defendant is shown to have been incompetent. Recognizing that the appellant's challenge to his guilty plea on grounds of incompetency was not raised on direct appeal, our Court nevertheless proceeded to examine the merits of the issue. We concluded that the PCHA court properly determined that the appellant possessed the mental capacity to enter a valid plea of guilt. Having failed to overcome the presumption that the appellant's failure to appeal was knowing and understanding, our Court affirmed the order of the PCHA court.[11]

We elaborated on that proposition in *Commonwealth v. Nelson,* 489 Pa. 491, 414 A.2d 998 (1980). There, the Court addressed an appeal from the denial of relief under the PCHA. The appellant raised the issue of whether trial counsel was ineffective in failing to request a hearing on appellant's competency to stand trial. This issue was abandoned by counsel at the PCHA hearing. We stated:

> We have long held that "the mental competence of an accused must be regarded as an absolute and basic condition of a fair trial." *Commonwealth v. Bruno,* 435 Pa. 200, 205 n. 1, 255 A.2d 519, 522 n. 1 (1969). Accordingly, we have been loath to find waiver of such a claim. *Commonwealth v. Marshall,* 456 Pa. 313, 318 A.2d 724 (1974).

---

**11.** To be precise, the *Fernandez* Court concluded that the appellant did not overcome the presumption that his failure to appeal was knowing and understanding, and *therefore* the claim was "waived." *Id.* at 298. Considering that the Court in the preceding paragraph explicitly stated that waiver of competency claims was precluded under the PCHA, the Court presumably employed the term "waived" to indicate that the appellant had not satisfied his burden of demonstrating incompetence.

Indeed, we have recently held that "when the issue presented is whether a person was competent to stand trial, the waiver rule is not applicable." *Commonwealth v. Tyson*, 485 Pa. 344, 348–50, 402 A.2d 995, 997 (1979).

It is, of course, true that *Tyson, id.*, and *Marshall, supra*, were direct appeals, and while *Bruno, supra*, was a collateral attack, it was not a PCHA petition. Nevertheless, our waiver doctrine, although judge-made and not statutory, is one we stringently apply. We have expressly discarded the "fundamental error" rule. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974). Thus, while not recognizing fundamental error, we nevertheless will not permit the waiver of a claim of incompetency, so basic is it to our concepts of justice that a trial of an incompetent is no trial at all. Although we recognize the PCHA includes a waiver provision of its own, 19 P.S. § 1180–3(d), having held the competency of an accused to be an absolute and basic condition of a fair trial, we further hold the no-waiver rule in *Tyson* to be applicable here as well.

414 A.2d at 1000–1001. As no competency hearing had been conducted, the Court remanded for an evidentiary hearing.[12]

Our Court reaffirmed the *Nelson* rule in *Commonwealth v. Giknis*, 491 Pa. 215, 420 A.2d 419 (1980). On appeal to our Court from the denial of PCHA relief, the appellant in *Giknis* raised the issue of whether the trial court had an independent basis upon which to determine his competence to enter a plea

---

**12.** Six Justices participated in the *Nelson* decision. Justice O'Brien drafted the lead opinion, which was joined by Chief Justice Eagen and Justice Nix. Although Justice Roberts filed a dissenting opinion, it is beyond cavil that he agreed with the rule of law cited *supra*. The first sentence of Justice Roberts' dissent states, "I agree with the majority that this Court must remand the record for further proceedings on appellant's competency claim." *Id.* at 1001. A remand would be unnecessary if the competency claim was found to have been waived. Justice Roberts went on to disagree with the *mandate* of the majority as he would have allowed *additional* claims of ineffective assistance of counsel to be fully litigated on remand, as opposed to solely the competency issue. Justice Flaherty also filed a dissenting opinion, which was joined by Justice Larsen, which disagreed with the resolution of the competency issue. As four of the six participating Justices agreed with the rule of law at issue here, *Nelson* is precedential authority on that proposition.

of guilt because the report issued by the Sanity Commission was inadequate. The appellant also contended that his due process rights had been violated when the trial court proceeded with his case in view of his questionable competency to stand trial. We initially noted that under normal circumstances, the two claims would be waived because the PCHA provided that an issue is waived if it "could have been raised before the trial, at trial, on appeal. . . ." *Id.* at 217–19, 420 A.2d at 420, citing Act of January 25, 1966, P.L. 1580, § 4, 19 P.S. § 1180–4 (Supp.1979–80). We recognized that appellant could have raised those issues prior to trial, at trial and on direct appeal, but did not do so. We declined to find the issues waived, however, based on our pronouncement in *Nelson.* Our Court proceeded to examine the substance of the competency claims based on the evidence of record and concluded that the appellant was competent at the time of trial. *Id.* at 421.

Having established that this Court has precluded the waiver of competency claims under the PCHA in *Fernandez, Nelson,* and *Giknis,* we must determine whether we reach the same result under the provisions of the PCRA.[13] The relevant provisions defining waiver in both statutes, however, are nearly identical in that they both provide that an issue is waived if it could have been raised on direct appeal. Accordingly, we hold that the failure to raise on direct appeal a claim that the appellant was incompetent at the time of trial does not constitute a waiver of that claim for purposes of the PCRA.

We clarify that our decision does not conflict with the seminal case of *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693 (1998), where this Court eliminated the capital case relaxed waiver rule on PCRA review. In order for the waiver rule to be "relaxed," the waiver doctrine must first be applica-

---

**13.** The Concurring Opinion disagrees with the analysis employed by this Court in *Fernandez, Nelson,* and *Giknis* and characterizes such decisions as "problematic," "uneven," and "frankly useless." Concurring opinion at 501–02, 506–08, 872 A.2d at 1163, 1166. With all due respect, such disparaging characterizations do not render the cases any less authoritative for the narrow proposition for which they were cited, namely, that this Court has precluded waiver of issues challenging the mental competency of the accused under the PCHA.

ble to the issue at hand. As demonstrated *supra*, it is well-settled that the issue of whether a defendant was competent to stand trial is not subject to the waiver rule. Thus, our abolition of the capital case relaxed waiver rule has no bearing on this issue. This being the case, we now proceed to address the merits of Appellant's claim.[14]

 Appellant argues that he was incompetent to stand trial and therefore his conviction and death sentence are unconstitutional In support of this claim, he attached to his PCRA petition the declaration of Dr. Richard Dudley, Jr., wherein Dr. Dudley states that based upon his examination of Appellant in 1999, he has "significant questions as to [Appellant's] capacity to assist trial counsel." Declaration of Dr. Richard Dudley, Appendix of Exhibits to Initial Brief of Appellant, Exhibit 14.

 A defendant is presumed to be competent to stand trial. *Commonwealth v. duPont*, 545 Pa. 564, 567–70, 681 A.2d 1328, 1330–31 (1996). Thus, the burden is on Appellant to prove, by a preponderance of the evidence, that he was

14. The Concurring Opinion repeatedly asserts that, contrary to a myriad of cases, our Court inappropriately "converts" the claim of ineffective of assistance of counsel into the underlying claim of whether Appellant was competent to stand trial. No such conversion has taken place. Consistent with the approach previously taken by this Court, we are simply examining the issue raised by Appellant. As noted, the issue presented in Appellant's Brief is whether he was "unconstitutionally tried while incompetent." Appellant's Brief at 2, Issue V. To the contrary, the issue raised in the appellant's brief in each case cited by the Concurrence was *whether counsel was ineffective* for failing to challenge the competency of the accused or request a competency hearing. *Commonwealth v. Marrero*, 561 Pa. 100, 102–03, 748 A.2d 202, 203 (2000); *Commonwealth v. Judge*, 568 Pa. 377, 385–87, 797 A.2d 250, 256 (2002); *Commonwealth v. Bracey*, 568 Pa. 264, 281–83, 795 A.2d 935, 945 (2001); *Commonwealth v. Basemore*, 560 Pa. 258, 271–73, 744 A.2d 717, 725 (2000); *Commonwealth v. Breakiron*, 556 Pa. 519, 529–30, 729 A.2d 1088, 1093, 1098 (1999); *Commonwealth v. Cross*, 535 Pa. 38, 41–43, 634 A.2d 173, 175 (1993); *Commonwealth v. Nelson*, 489 Pa. at 493–95, 414 A.2d at 999. As we find that the issue presented by Appellant is not subject to the waiver rule, we see no need to address it under the guise of ineffective assistance of counsel. To the extent, however, that Appellant additionally argues that appellate counsel was ineffective for failing to challenge his competency, such claim fails as we conclude that there is no arguable merit to the underlying issue.

incompetent to stand trial. In order to prove that he was incompetent, Appellant must establish that he was either unable to understand the nature of the proceedings against him or to participate in his own defense. *Commonwealth v. Hughes*, 521 Pa. 423, 434–36, 555 A.2d 1264, 1270 (1989); *see also* 50 P.S. § 7402(a). Appellant has failed to satisfy this standard.

The report of Dr. Dudley discloses that his examination of Appellant took place eight years after Appellant's trial. While Dr. Dudley states that he has "significant questions" regarding Appellant's capacity to assist trial counsel, he has not stated that Appellant was incompetent in 1991 when the trial occurred. Moreover, when evaluated by the court psychologist on December 10, 1991, Appellant was found "capable of understanding a sentencing procedure." The doctor also found that Appellant "does not suffer from a major illness." Trial counsel, who worked with the defendant from the time of his arrest until after his trial, saw no reason to raise the issue of defendant's competency and, instead, argued that he acted in self-defense. The PCRA court, therefore, properly concluded that the defendant was able to consult with counsel rationally and possessed a rational and factual understanding of the proceedings.

Appellant next argues that the proportionality review performed by this Court on direct appeal denied him due process (Argument IX).[15] This Court has consistently recognized that issues regarding the proportionality of capital sentences were decided by our Court on direct appeal and are therefore previously litigated and beyond the purview of the PCRA. See *Commonwealth v. Edmiston*, 578 Pa. 284, 312–13, 851 A.2d 883, 900 (2004); *Commonwealth v. Albrecht*, 720 A.2d at 708; *Commonwealth v. Wharton*, 571 Pa. 85, 106–08, 811 A.2d 978, 991 (2002). Appellant, however, is not challenging the proportionality of his sentence, but rather the method of review our Court employed on direct appeal. As the PCRA petition was the first opportunity for Appellant to raise such a

---

**15.** Although the PCRA court did not specifically address this issue, it was listed as Issue V in Appellant's Supplemental PCRA petition dated June 16, 1999.

claim, we shall entertain the merits of the issue. *See Commonwealth v. Edmiston,* 851 A.2d at 900.

At the time of Appellant's trial, this Court was required to determine whether his death sentence was "excessive or disproportionate to the penalty imposed in similar cases." 42 Pa.C.S. § 9711(h)(3)(iii).[16] Appellant contends that our Court's proportionality review utilized an inaccurate database without providing Appellant's counsel notice and an opportunity to participate. This identical claim was raised and rejected in *Commonwealth v. Edmiston,* 578 Pa. at 313–15, 851 A.2d at 901, where we recognized that our Court has consistently upheld the validity of our proportionality review against similar challenges. *See also Commonwealth v. Marshall,* 571 Pa. 289, 308–10, 812 A.2d 539, 551–52 (2002); *Commonwealth v. Wharton,* 811 A.2d at 991; *Commonwealth v. Gribble,* 550 Pa. 62, 89–91, 703 A.2d 426, 440 (1997).

Appellant next argues that the PCRA court erred in failing to grant him an evidentiary hearing on his PCRA claims (Argument XXII). Appellant, however, does not identify which of his various issues warrant an evidentiary hearing. Rather, he asserts that, "based on the myriad material issues of fact requiring evidentiary resolution, it was error for the court below to dismiss Appellant's petition without granting a hearing first." Appellant's Brief at 94. Such a broad declaration of error is insufficient to warrant relief.

Appellant also argues that the PCRA court erred in denying his requests for discovery (Argument XXIII). He asserts that he sought "discovery of, *inter alia,* whether any witness received payments in return for their [sic] testimony as part of the District Attorney's witness protection program and the discovery provided to trial counsel as well as any

---

**16.** In 1997, the General Assembly repealed the requirement of proportionality review. This Court continues to undertake proportionality review on direct appeal of death sentences in cases where the sentence of death was imposed prior to June 25, 1997, the effective date of the repeal. See, *Commonwealth v. Edmiston,* 578 Pa. 284, 312 n. 11, 851 A.2d 883, 900 n. 11 (2004); *Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426 (1997).

other *Brady* material that exists in this case, and any notes or training policies on jury selection and the use of peremptory jury strikes in this and other cases." Appellant's Brief at 95. Appellant fails to specify what *Brady* materials he sought. Moreover, his entire argument in support of this claim is his assertion that the Philadelphia District Attorney's Office acknowledged making undisclosed payments and housing arrangements for witnesses in other cases. Such allegation falls woefully short of establishing entitlement to relief. In addressing a similar claim in *Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585 (2000), we stated:

> The petition fails to tie the broad allegations regarding the District Attorney's policy of paying witnesses to the witnesses in Appellant's own case. Allusions to discovery violations in other cases are insufficient to demonstrate that any such violations existed in this case. Appellant has not presented one iota of evidence, such as an affidavit from one of the witnesses in his case, to suggest that any of those witnesses received any economic benefits. We will not sanction a fishing expedition when Appellant fails to provide even a minimal basis for his claim. As Appellant fails to make a showing of exceptional circumstances pursuant to Pa.R.Crim.P. 1502(e)(1), the court below did not abuse its discretion in failing to grant the motion.

560 Pa. at 498–500, 746 A.2d at 591.[17] Accordingly, Appellant has failed to demonstrate that the PCRA court abused its discretion in denying his requests for discovery.

Finally, Appellant contends that the cumulative effect of the errors he has alleged in his brief entitle him to relief (Argument XXI). Because we find no merit to any of Appellant's claims, their alleged cumulative effect does not warrant relief. *See Commonwealth v. Blystone*, 555 Pa. 565, 586–88, 725 A.2d

17. Rule 1502, which was renumbered as Rule 902, effective April 1, 2001, provides that "no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause." Pa.R.Cr.P. 902. As this rule was enacted on August 11, 1997, after Appellant's petition was filed, it is inapplicable. Our discussion in *Lark* regarding the inadequacy of the appellant's claim, however, is relevant to our disposition of the instant claim.

1197, 1208–09 (1999) ("No amount of failed claims may collectively attain merit if they could not do so individually.").

Accordingly, we affirm the order of the PCRA court.[18]

Justice CASTILLE files a concurring opinion in which Mr. Justice Eakin joins.

Justice NIGRO files a concurring and dissenting opinion.

Justice SAYLOR files a dissenting opinion.

Justice CASTILLE, concurring.

I join the Majority Opinion, except for its discussion of appellant's layered claim of ineffective assistance of counsel deriving from counsels' failure, at trial and on direct appeal, to challenge his mental competence to be tried. *See* Majority op. 582 Pa. at 484–91, 872 A.2d at 1153–57. I respectfully disagree with the Majority's conversion of this ineffectiveness claim into the underlying and waived claim of competency itself, based upon the Majority's conclusion that competency claims are not subject to the waiver provision of the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* In so doing, the Majority has ignored relevant legislation by creating a judicial relaxed waiver rule that defeats the PCRA's waiver provision and assures that there will never be finality in appeals from criminal convictions. I also write separately to address a concern I have with the proper characterization and effect of unsworn witness statements which appellant proffers to this Court as if they were the "affidavits" of those witnesses.

Following the approach taken in the recent plurality opinion in *Commonwealth v. Santiago,* 579 Pa. 46, 855 A.2d 682 (2004) (plurality opinion by Cappy, C.J.), the Majority dismisses the fact that appellant's claim is posed as one sounding in the layered ineffective assistance of his previous counsel, *see* Brief for Appellant, 42–43; converts and reviews the claim as the

18. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor within ninety days of our decision in accordance with 42 Pa.C.S. § 9711(i).

underlying waived claim of incompetency itself; holds that such claims are immune from the PCRA's waiver provision; and then proceeds to evaluate the merits of the waived claim as if this appeal were appellant's second direct appeal, rather than a collateral attack upon his final judgment. In my Concurring Opinion in *Santiago*, I addressed the propriety of the Court approaching a competency/ineffectiveness claim in such a fashion and I rely upon that Concurring Opinion as the primary basis for my disagreement with the Majority's approach in the case *sub judice*. *See Santiago*, 579 Pa. at 82–94, 855 A.2d at 704–11 (Castille, J., joined by Eakin, J., concurring). The Majority, however, has articulated on appellant's behalf new theories in support of the *Santiago* plurality's conclusion that claims deriving from a defendant's alleged mental incompetence to stand trial are exempt from the PCRA waiver provision. I write to address the new theories the Majority poses.

The *Santiago* plurality declared that mental competency claims are an exception to the statutory command that issues not raised at trial or on appeal are waived under the PCRA, citing as sole support a 1970s-era judicial non-waiver doctrine crafted by this Court in direct appeal cases. *See* 579 Pa. at 63 n. 9, 855 A.2d at 691–92 n. 9. The Majority in the case *sub judice* takes a step forward from the *Santiago* plurality and at least acknowledges that PCRA matters are not the same as direct appeals. The Majority nevertheless "reaffirms" the unexplained position in the *Santiago* plurality, putting forth two new theories to support the plurality's assumption that competency to stand trial claims are forever subject to relaxed waiver treatment. First, the Majority argues that, as a matter of statutory construction, the PCRA waiver provision was not intended by the General Assembly to apply to defaulted claims of mental competency to be tried. Second, the Majority argues that a trio of 1980 decisions from this Court under the Post Conviction Hearing Act ("PCHA"),[1] the statutory predecessor of the PCRA, empowers and requires this

---

1. Act of January 25, 1966, P.L. (1965) 1580, *codified at* 19 P.S. § 1180-1 *et seq.* The PCHA was repealed in part, modified in part, and renamed the Post Conviction Relief Act, effective April 13, 1988.

Court to craft a judicial "relaxed waiver" exception despite the PCRA's explicit waiver provision. In my view, neither of these new-found theories remotely supports the judicial usurpation represented by the Majority's relaxed waiver holding and its conversion of the layered ineffective assistance of counsel claim actually posed here.

The most basic tenet of Pennsylvania statutory interpretation is that courts must ascertain and effectuate the intention of the General Assembly. 1 Pa.C.S. § 1921(a); *In re Canvass of Absentee Ballots of November 4, 2003 General Election,* 577 Pa. 231, 241–43, 843 A.2d 1223, 1230 (2004); *Hannaberry HVAC v. Workers' Compensation Appeal Board (Snyder, Jr.),* 575 Pa. 66, 77–79, 834 A.2d 524, 531 (2003). The plain language of a statute is generally the best indication of legislative intent. *Commonwealth v. Gilmour Manufacturing Co.,* 573 Pa. 143, 148–49, 822 A.2d 676, 679 (2003). Thus, the Statutory Construction Act mandates that, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b); *see also Canvass of Absentee Ballots,* 577 Pa. at 241–43, 843 A.2d at 1230 (citing *Scheipe v. Orlando,* 559 Pa. 112, 117, 739 A.2d 475, 478 (1999)); *Pennsylvania Financial Responsibility Assigned Claims Plan v. English,* 541 Pa. 424, 429–31, 664 A.2d 84, 87 (1995) ("Where the words of a statute are clear and free from ambiguity the legislative intent is to be gleaned from those very words."). Courts may resort to other considerations to divine legislative intent only when the words of the statute are not explicit. 1 Pa.C.S. § 1921(b). Thus, this Court has consistently held that the rules of statutory construction are to be utilized only where the statute at issue is ambiguous. *Canvass of Absentee Ballots,* 577 Pa. at 241–43, 843 A.2d at 1230 (citing *O'Rourke v. Commonwealth, Dept. of Corrections,* 566 Pa. 161, 172–74, 778 A.2d 1194, 1201 (2001)); *see also Ramich v. Worker's Compensation Appeal Bd. (Schatz Electric, Inc.),* 564 Pa. 656, 662–64, 770 A.2d 318, 322 (2001); *English,* 664 A.2d at 87.

The PCRAs waiver provision is drafted in plain and unambiguous terms: "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, . . . on appeal

or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b). This Court has construed the waiver provision according to its plain terms. *E.g., Commonwealth v. Bond,* 572 Pa. 588, 598–600, 819 A.2d 33, 39 (2002) (issues are waived under PCRA if appellant could have presented them on direct appeal but failed to do so); *Commonwealth v. Bracey,* 568 Pa. 264, 273–74, 795 A.2d 935, 940 (2001) (same). The statute contains no "relaxed waiver" exception. Here, the Majority actually recognizes that the always-counseled appellant unquestionably "could have raised" a mental competency claim at trial or on direct appeal. Indeed, because such a claim would have been shielded from ordinary judicial waiver principles on direct review by a judicial "relaxed waiver" rule governing direct appeal review of competency claims, *see Commonwealth v. Tyson,* 485 Pa. 344, 402 A.2d 995 (1979); *Commonwealth v. Marshall,* 456 Pa. 313, 318 A.2d 724 (1974), appellant and his lawyers had a uniquely broad opportunity to raise a competency claim. Because appellant did not do so, under the plain and unambiguous language of the statute, any claim sounding in competency is waived and is therefore unavailable on collateral attack.

The Majority nevertheless concludes that the waiver provision cannot be applied according to what the provision plainly says, because the General Assembly had a different, but unexpressed, intention with respect to some defaulted claims. In its invocation of principles of statutory construction to defeat the plain meaning of the statute the Majority fails to identify any ambiguity in the statute. Since the polestar of ambiguity is lacking, there is no room for the Majority's statutory construction. Absent constitutional infirmity—and none has been argued by appellant or by the Majority on his behalf—the plain language of the statute controls.

To achieve its preferred non-waiver result, the Majority in effect rewrites the post conviction relief statute. The Majority states that the statute must be read as if it said that the only defaulted claims waived for PCRA purposes are those claims that "are required to be preserved" at trial. But the statute does not say this. Indeed, the statute does not speak

in terms of ephemeral judicial issue preservation doctrines **at all.** Instead, the PCRA waiver provision—contained in a statute that affords criminal defendants that which is afforded to no other litigant, *i.e.*, a chance to undo a final judgment— rationally speaks only in terms of previous **opportunities** to raise a claim, *i.e.*, whether the petitioner **could have raised** the claim before, but failed to do so. There is no absurdity in reading this sensible restriction upon collateral review according to its plain language. The appropriate and preferred time to raise claims either monumental or small, constitutional or otherwise, is when they are ripe-when the record is fresh, when a fair opportunity to respond exists, and when a fair and timely resolution is possible. A claim which could have been raised at a point where relief could have been afforded and error averted, but was not, is properly deemed defaulted and merges into the final judgment. Such a foregone claim should be reviewable on collateral attack **only as the collateral attack that it is,** and as authorized by the General Assembly. The quintessential collateral claim, one specifically deemed cognizable under the PCRA, is a claim of counsel ineffectiveness. This form of the claim is the only logical way to retroactively inquire into a defaulted competency issue:

> Instantly no competency hearing was held, nor was one requested. The issue as it had survived for us, then, is not whether appellant would have passed the two-pronged test for competency, it is rather only whether his counsel was ineffective for failing to raise the claim that he would not.

*Commonwealth v. Nelson,* 489 Pa. 491, 414 A.2d 998, 1001 (1980) (plurality opinion) (footnote omitted).

Moreover, even if judicial "construction" of this plain and unambiguous statute were appropriate, it is the Majority's rewriting of the provision to include relaxed waiver which will lead to absurdity. Under the Majority's rewriting, issues which had to be objected-to at trial in order to be reviewable on direct appeal are subject to PCRA waiver, while issues which did not have to be objected-to at trial in order to be reviewable on direct appeal are "not subject to the waiver provision of the PCRA." Op. at 486–88, 872 A.2d at 1154. In

other words, claims which would have been subject to "relaxed" judicial waiver rules on direct appeal carry their relaxed waiver status forevermore, rendering the claims immune from PCRA waiver. But, if the Majority is correct in this reconstruction of the statute, then this Court's decision in *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998), is demonstrably wrong.

The rather esoteric direct appeal relaxed waiver rule innovated for competency claims in *Marshall* and *Tyson* is not the most familiar of this Court's historic relaxed waiver rules: that status belongs to the relaxed waiver rule formerly applicable in direct capital appeals.[2] When *Albrecht*, a capital PCRA appeal, was decided, the capital relaxed waiver rule still existed. That doctrine provided that this Court would review claims for which the record permitted review even if those claims would otherwise have been waived—*i.e.*, **even if they were not preserved below.** Thus, under that issue preservation scheme, record-based claims of error were not "required to be preserved" in order to be reviewed. 720 A.2d at 700. For purposes of reviewability, such defaulted claims were treated in the same manner as defaulted claims of competency to stand trial. And yet, the *Albrecht* Court abrogated relaxed waiver on PCRA review—unequivocally and without exception—thereby rendering the previously nonwaivable claims defaulted. Moreover, the *Albrecht* Court emphasized that it was so limiting the **judicial relaxed waiver rule** in part because "application of the doctrine of relaxed waiver in a PCRA proceeding runs afoul of the very terms of the Post–Conviction Relief Act, which excludes waived issues from the class of cognizable PCRA claims." Accordingly, claims subje ct to PCRA waiver would be reviewed only when raised under the guise of ineffective assistance of counsel. *Id.* Thus, *Albrecht* recognized the proper role of the General Assembly on the question of PCRA waiver.

---

**2.** This Court has since abrogated the direct capital appeal relaxed waiver rule. *See Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), *cert. denied*, —— U.S. ——, 125 S.Ct. 30, 160 L.Ed.2d 31 (2004).

If the PCRA waiver provision truly was "intended to mean" what today's Majority says—*i.e.*, once relaxed waiver, always relaxed waiver—then the principled underpinning of *Albrecht* has just been eviscerated. Contrary to the *Albrecht* Court's understanding, a PCRA court's declining to deem waived claims which were not required to be preserved at trial because of relaxed waiver principles could not run afoul of the PCRA waiver provision because that provision was "intended to apply" only to claims which were "required to be preserved." And yet, countless capital PCRA petitioners since *Albrecht* have seen their previously "nonwaivable" claims dismissed upon PCRA waiver grounds. If the Majority believes that relaxed waiver must be resurrected on PCRA review in this instance, it should squarely address and overrule *Albrecht*, instead of creating a hopelessly contradictory PCRA waiver jurisprudence.

The Majoritys construction of the PCRA waiver provision also ignores the fact that until now this Court has not interpreted the PCRA as affording special treatment to defaulted claims of mental competency to be tried. As I noted in my Concurring Opinion in *Santiago*, the plurality's approach there (which is now echoed by the Majority here) is squarely inconsistent with this Court's decision in *Commonwealth v. Marrero*, 561 Pa. 100, 748 A.2d 202 (2000) (layered claim of counsel ineffectiveness arising from defaulted competency claim addressed and rejected on Sixth Amendment merits, without converting claim into supposedly-non-waivable claim of incompetency itself). *Marrero* represents the prevailing PCRA interpretation in this Court. In cases decided under the PCRA (including *Albrecht* itself), this Court has routinely applied waiver principles to claims involving competency and/or it has routinely analyzed ineffectiveness claims deriving from defaulted competency issues as cognizable ineffectiveness claims, without converting them into waived competency issues whose waiver must be "relaxed" under the PCRA. *See Commonwealth v. Judge*, 568 Pa. 377, 385–86 n. 12, 797 A.2d 250, 256 n. 12, 259–60 (2002) (per Newman, J.) (holding that all PCRA claims—including claim asking "Is Appellant entitled to

relief because counsel failed to request, and the court failed to order, a competency evaluation when appellant manifested extreme mental and emotional disturbance during his guilt-stage testimony"—were waived because they could have been raised on direct appeal, but were defaulted in light of appellant's prior fugitive status); *Commonwealth v. Bracey*, 568 Pa. 264, 281–84, 795 A.2d 935, 945–46 (2001) (per Nigro, J.) (deciding on merits claim that counsel was ineffective for failing to challenge appellant's competency to stand trial, without converting claim into non-waivable underlying claim of incompetency itself); *Commonwealth v. Basemore*, 560 Pa. 258, 271–73, & 275 n. 8, 744 A.2d 717, 725 & 727 n. 8 (2000) (per Saylor, J.) (claim of counsel ineffectiveness in failing to develop and present evidence of incompetence or request incompetency hearing was waived because not raised in PCRA court; and specifically declining to address appellant's argument that claims implicating competency cannot be deemed waived); *Commonwealth v. Breakiron*, 556 Pa. 519, 538–41, 729 A.2d 1088, 1098–99 (1999) (per Newman, J.) (claim of ineffectiveness for failing to litigate competency issue reviewed as ineffectiveness claim, not as unwaivable underlying claim of incompetency itself); *Commonwealth v. Albrecht*, 554 Pa. at 56 & n. 13, 720 A.2d at 706 & n. 13 (per Cappy, J.) (PCRA claim sounding in ineffective assistance of counsel for failing to "determine whether the defendant's competency to assist in his own defense was affected by the heavy medication he was receiving during the trial" was waived for want of development); *Commonwealth v. Cross*, 535 Pa. 38, 44–46, 634 A.2d 173, 176 (1993) (per Montemuro, J.) (claim of ineffectiveness for failing to adequately investigate appellant's competence evaluated as ineffectiveness claim, not converted into underlying competency claim).[3,4]

3. The Majority would distinguish these cases on the ground that the competency issue allegedly was presented in them **only** in the guise of ineffective assistance of counsel. Op. at 490 n. 14, 872 A.2d at 1156 n. 14. Respectfully, this is simply not so. Appellant's Brief in this case poses this claim in the very same fashion that capital PCRA claims have typically been raised to this Court in **all** of these cases: the underlying waived claim is developed and it is then accompanied by a boilerplate or near-boilerplate assertion of counsel ineffectiveness, in an effort to overcome the obvious waiver. It is a relic of relaxed waiver briefing.

4. Footnote 4 appears on page 502.

Equally unpersuasive is the Majority's reliance upon three 1980 decisions from this Court decided under the PCHA—*Commonwealth v. Fernandez*, 487 Pa. 493, 410 A.2d 296 (1980), *Nelson*, 489 Pa. 491, 414 A.2d 998, and *Commonwealth v. Giknis*, 491 Pa. 215, 420 A.2d 419 (1980). Indeed, these cases are so problematic as a jurisprudential matter—in their failure to account for one another despite being decided within months of each other, while outlining no less than three distinct approaches to the waiver question under the PCHA—that it is unwise in the extreme to hold them up as if they established some harmonious PCHA precedent, much less to suggest that they operated prospectively to preempt the waiver options available to the General Assembly when it adopted the PCRA.

The Majority is mistaken in deeming these three cases to inform, much less control, the waiver question under the PCRA. The Majority declares that the PCHA and PCRA statutory waiver paradigms "are nearly identical." This is not so. The PCHA waiver provision at issue in *Fernandez, Nel-*

A series of law review articles could be written on this Court's struggles the last five years over the "pleading and proof" complications in PCRA appeals arising from this manner of pleading and this Court's non-prospective abrogation of PCRA relaxed waiver in *Albrecht. See generally Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003); *see also Commonwealth v. Ford*, 570 Pa. 378, 809 A.2d 325, 337 (2002) (Saylor, J., concurring), *cert. denied*, 540 U.S. 1150, 124 S.Ct. 1144, 157 L.Ed.2d 1044 (2004). The unfortunate truth is that there is no material distinction in the briefing in these cases, only a distinction in the way the Majority in this particular case has elected to treat the pleadings.

4. As a final point concerning statutory construction, it is also worth noting that the Majority's assumption that the General Assembly intended special treatment for claims involving mental competency is contradicted by the overall structure of the Act. Competency claims are not the only claims which have been afforded special treatment against judicial waiver doctrines. Claims implicating the jurisdiction of the court and claims of sentencing illegality have also been shielded from waiver. These claims, unlike competency claims, involve the very legitimacy of the court's asserted power over the individual. It is notable that the PCRA specifically deems cognizable claims involving the jurisdiction of the court and sentences exceeding the lawful maximum, *see* 42 Pa.C.S. § 9543(a)(2)(vii) & (viii), while no such special status is afforded to claims involving mental competency. Instead, for PCRA purposes, it is plain that the General Assembly intended such claims to be treated precisely the same as other claims of error.

*son,* and *Giknis* provided that an issue was waived under that Act only if "[t]he petitioner **knowingly and understandingly** failed to raise it and it could have been raised before the trial, at the trial, on appeal," etc. *See Fernandez,* 487 Pa. at 494–98, 410 A.2d at 297–98 (quoting 19 P.S. § 1180–4(b)(1)) (now repealed by PCRA) (emphasis supplied). Even if an issue was knowingly and understandingly waived, the PCHA permitted the petitioner to negate the waiver if he could "prove the existence of extraordinary circumstances to justify his failure to raise the issue." *Fernandez,* 487 Pa. at 496–98, 410 A.2d at 298 (quoting 19 P.S. § 1180–4(b)(2)).[5] In contrast, the PCRA waiver provision contains no requirement whatsoever that the failure to raise a claim must be knowing and understanding, nor does it allow a waiver of an issue to be negated by proof of extraordinary circumstances. This Court's precedent under the distinctly different waiver language of the PCHA simply cannot control the question of how properly to interpret the far different language of the PCRA. Perhaps this fact explains why this Court in practice has not previously treated mental competency claims as if they were impervious to PCRA waiver.

This distinction in the PCHA's waiver standard as opposed to that found in the PCRA is not merely academic; indeed, it was essential to the unanimous decision in *Fernandez,* the first-in-time of the trio of cases cited by the Majority. As a matter of statutory interpretation, the *Fernandez* case is the only one of the three 1980 cases that makes any remote sense, since it is the only one which purports to apply the language of the statute, and thereby to recognize that the General Assembly is permitted a role in post-conviction matters. In holding that the defaulted competency claim in *Fernandez* **could be** reviewable under the PCHA, the Court specifically invoked the distinct "knowing and understanding" language of the PCHA. Moreover, the *Fernandez* Court ultimately concluded that the competency claim was waived. The relevant analysis and holding reads as follows:

5. Claims of ineffective assistance of counsel soon proved to be the most common "extraordinary circumstance" invoked to negate the PCHA waiver.

Fernandez's contention here, that his plea was invalid due to his mental incapacity, is an issue that could have been raised on direct appeal and would, thus, be waived unless he rebuts the presumption that his failure to file a direct appeal was knowing and understanding or proves that extraordinary circumstances existed excusing his failure to file a direct appeal. Yet, proof that a defendant lacked the mental capacity to "knowingly and intelligently" enter a plea of guilty would be sufficient to rebut the presumption of a "knowing and understanding" failure to appeal where the incapacity shown is non-transitory. Mental incapacity, sufficient to prevent the entering of a valid guilty plea, would also prevent a "knowing and understanding" failure to appeal.

In the present case, the PCHA court concluded Fernandez did possess the mental capacity to enter a valid plea of guilt. Our examination of the record persuades us that this conclusion is warranted by the evidence. Fernandez has, therefore, failed to overcome the presumption that his failure to appeal was knowing and understanding. Thus, his claim was waived.

487 Pa. at 496–98, 410 A.2d at 298 (footnotes omitted).

The Majority's reliance upon the *Nelson* case is misplaced for distinct and multiple reasons peculiar to it. First, despite the fact that *Nelson* involved a similar issue and was decided a mere two months after the unanimous decision in *Fernandez,* neither the *Nelson* plurality opinion nor the responsive opinions ever cited to *Fernandez;* it is as if there were two different jurisdictions at work. Second, despite the Majority's argument to the contrary, the notion that *Nelson* is a precedential decision is plainly erroneous. A "majority opinion" is "[t]he opinion of an appellate court in which the majority of its members **join**." *Black's Law Dictionary* (6th ed.1990), at 955 (emphasis added). In contrast, a "plurality" opinion is "[a]n opinion of an appellate court in which more justices join than in any concurring opinion (though not a majority of the court) . . . ." *Id.* at 486–88, 872 A.2d at 1154. The key to precedential status in an appellate opinion is the tally of

"joining" votes. Agreement with, or concurrence in a mandate, is not a "joinder," much less is it a joinder in the crucial *ratio decidendi* of the case. Indeed, even a joinder in a "disposition" is just a more polite way of saying, "I join in the result only"—it is not a joinder for purposes of establishing precedent.

In *Nelson,* only three of the six participating Justices **joined** in the plurality opinion; the other three were in a dissenting posture. The Majority nevertheless argues that *Nelson* is precedential "for the rule of law at issue here"—*i.e.,* apparently, a rule that this Court has the power to dictate to the General Assembly that defaulted mental competency claims are beyond its power to deem waived on collateral attack—by relying upon the dissenting opinion of Mr. Justice Roberts as the crucial fourth vote. Op. at 488 n. 12, 872 A.2d at 1155 n. 12. But, Justice Roberts' dissent did not **join** in any part of the *Nelson* plurality opinion, nor was it even a concurring and dissenting opinion, which might indicate joinder in the disposition, if not the rationale. All that Justice Roberts indicated was his "agreement" to remand the record for further proceedings on the competency-based claim, without explaining what further proceedings he contemplated. Justice Roberts never signed on to the rationale of the lead opinion and we cannot pretend that he did. Plurality opinions, by definition, establish no binding precedent for future cases. *E.g., Commonwealth v. Bethea,* 574 Pa. 100, 110–12, 828 A.2d 1066, 1073 (2003); *Hoy v. Angelone,* 554 Pa. 134, 143–45, 720 A.2d 745, 750 (1998); *see also Interest of O.A.,* 552 Pa. 666, 676 n. 4, 717 A.2d 490, 496 n. 4 (1998) (Opinion Announcing Judgment of Court by Cappy, J.) ("While the ultimate order of a plurality opinion, *i.e.* an affirmance or reversal, is binding on the parties in that particular case, legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority.").

Third, even if Justice Roberts' agreement that a remand was required in *Nelson* could be deemed a joinder in the "rule of law" *Nelson* "established," it requires noting that the rule thereby "established" by *Nelson* was that a waived claim of mental incompetency is reviewable only as a claim sounding in ineffective assistance of counsel. Thus, in the very next

paragraphs following the Majority's abbreviated quotation from *Nelson*, the plurality actually **disposed of the case** as follows:

> Instantly no competency hearing was held, nor was one requested. The issue as it had survived for us, then, is not whether appellant would have passed the two-pronged test for competency, it is rather only whether his counsel was ineffective for failing to raise the claim that he would not.
>
> Accordingly, the case is remanded for an evidentiary hearing to determine whether trial counsel had "any reasonable basis" for foregoing a claim of "arguable merit." . . . Following such hearing should the court determine trial counsel was ineffective for not requesting a competency hearing, it should order such a hearing. . . . If no ineffectiveness is found, the judgment of sentence is affirmed.

414 A.2d at 1001 (footnote and citations omitted). Thus, if *Nelson* is truly precedential, it stands for the proposition that where, as here, a competency claim has been defaulted at trial without a hearing, a collateral claim implicating competency is reviewable only as a claim sounding in the ineffective assistance of counsel. Coincidentally, that is how appellant in this case poses his claim, and it is how the appellant in *Santiago* posed his claim. Both the *Santiago* plurality and today's Majority act contrary to *Nelson* in converting the claim.

The third 1980 case, *Giknis*, was filed five months after *Nelson* and was written by the author of the *Nelson* plurality opinion. Like *Fernandez*, *Giknis* was a unanimous decision in a case involving a defendant who had pleaded guilty to murder and belatedly sought to challenge his competency on PCHA review. The *Giknis* Court, like the *Nelson* Court, inexplicably failed to cite or even to acknowledge the unanimous opinion in *Fernandez*. In addition, the *Giknis* Court approached the competency/waiver question differently than either *Fernandez* or *Nelson*—without purporting to distinguish, limit, or overrule those decisions. Thus, although *Giknis* quoted the PCHA waiver provision, including its "knowing and understanding" standard, *Giknis* did not follow *Fernandez*. Indeed, the *Giknis* Court did not inquire into the circumstances of the

waiver at all. Nor did the author of *Giknis* follow his plurality opinion in *Nelson* and remand for an ineffectiveness hearing on the question of why trial counsel failed to challenge his client's competency to be tried.

Instead, the *Giknis* Court cited that portion of the *Nelson* plurality opinion which had cited *Marshall* and *Tyson* for the tangential proposition that competency claims are not waivable **on direct appeal** and concluded, without further explanation, that the two competency issues raised on collateral review in *Giknis* therefore must be reached on the merits. This rather remarkable, truncated analysis never acknowledged or realized that: (1) *Tyson* and *Marshall* involved direct appeals; (2) *Nelson* was a non-binding plurality opinion; (3) in any event, the language quoted from *Nelson* did not reflect the *Nelson* Court's disposition, which considered the defaulted competency claim to be reviewable only as an ineffectiveness claim; (4) *Fernandez* was recent, unanimous precedential authority which took a different, statutorily-based approach to the PCHA waiver question; and (5) the *Nelson* plurality had recognized that *Marshall* and *Tyson* were direct appeal cases, not PCHA cases. To further add to the confusion on the Court in these cases, *Giknis* then went on to analyze the competency question **both** as a direct review matter and as an ineffectiveness matter, ultimately citing to the PCHA testimony of trial counsel as justifying his decision not to challenge competency: "[a]s counsel would best be in a position to judge the ability of a client to communicate to aid in a defense and the ability to comprehend the nature of the charges, we cannot find that counsel was ineffective...." *Giknis*, 491 Pa. 219–21, 420 A.2d at 421–22.

I would avoid reliance upon these quarter-century old PCHA cases because, to put it mildly, they are uneven. No less than three distinct and conflicting approaches to PCHA waiver can be gleaned from the cases, and yet, the Court which issued all three rulings closely in time made no attempt to harmonize the divergent rulings. Moreover, the cases involved a very different statutory waiver standard, and thus, they are not relevant to the inquiry under the PCRA. And

finally, the cases are frankly useless as a jurisprudential matter because they never explain or justify the crucial separation of powers issue of how it is that a Court faced with unambiguous statutory language may simply manufacture a judicial exception to that explicit language.

It is obvious that some Justices feel very strongly about mental competency claims, and would prefer that the General Assembly had afforded special relaxed waiver status to claims sounding in competency to be tried. But, the General Assembly clearly did not do that, and I would not rewrite the statute to indulge a different judicial preference. Moreover, I would not conclude that this Court has existing rational precedent which acts to prohibit the General Assembly from deeming defaulted competency claims to be unavailable for review under the PCRA. None of the cases cited by the Majority purport to hold that the General Assembly lacks constitutional authority to deem claims sounding in competency to be waivable, just like the vast majority of claims of constitutional and non-constitutional dimension. Moreover, the PCRA's review paradigm is not irrational. A defaulted competency claim can be litigated in a far more rational fashion through the lens of a claim sounding in counsel ineffectiveness—counsel, after all, is in the best "position to judge the ability of a client to communicate to aid in a defense and the ability to comprehend the nature of the charges. . . ." *Giknis,* 420 A.2d at 422.

In a system of separated powers, the only theoretically legitimate question which could arise from the *sua sponte* concern of the *Santiago* plurality and today's Majority is whether application of the PCRA waiver provision to claims sounding in competency to be tried would be **unconstitutional.** Such an argument—which itself would pose a distinct (and presumably waivable) procedural claim of constitutional dimension—is not before us. If the question of constitutionality is the Majority's true concern, it should await the case where the claim is raised directly, and decide it then. In the absence of a finding of unconstitutionality, we should not resurrect the PCRA relaxed waiver rule to negate proper legislative authority.

The Majority's radical and unwise rewriting of the PCRA waiver provision will prove particularly harmful given this Court's recent relaxed waiver decision in *Commonwealth v. Roney,* 581 Pa. 587, 866 A.2d 351 (2005). In *Roney,* this Court was faced with the question of whether a waived penalty phase jury instruction claim, premised upon the new procedural rule in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), could be reached and decided on the merits on direct appeal. *Roney* afforded the appellant the retroactive benefit of the new rule, notwithstanding his waiver of the claim, reasoning that "because the challenge to a sentence premised upon *Apprendi* implicates the legality of that sentence, it cannot be waived on appeal." 581 Pa. 600–01 n. 32, 866 A.2d at 359 n. 32 (citing *Commonwealth v. Aponte,* 579 Pa. 246, 250 n. 1, 855 A.2d 800, 802 n. 1 (2004)).

*Roney* apparently will dictate that all sentencing claims of alleged constitutional dimension now implicate "legality" and therefore need not be preserved in order to be raised on direct appeal. By the logical operation of the Majority's tortured statutory interpretation in the present case, such non-waivable constitutional sentencing claims will also no longer be subject to the PCRA's waiver provision. And so, constitutional sentencing claims, like competency claims, are impervious to waiver. Such claims not only need never be preserved, but they may be raised will-nilly: for the first time in a PCRA petition; or as late as PCRA appeal; or, in light of unfortunate cases such as *Fajohn v. Commonwealth,* 547 Pa. 649, 692 A.2d 1067 (1997), anytime in the future when the defendant feels like filing an "illegal sentence" motion *nunc pro tunc.* Indeed, there is nothing in the *ad hoc* relaxed waiver review reemerging in cases such as this and *Roney* to prevent entirely **prospective** procedural rules of constitutional dimension affecting sentencing to become retroactively enforceable, and thus available to upset a proper final judgment.

Since the waiver in question on direct appeal derives from judicial doctrines, it is certainly within this Court's power to craft such exceptions, as it did in *Roney*—albeit unwisely in

my view. *See* 581 Pa. at 603–11, 866 A.2d at 362–66 (Castille, J., concurring). But, the waiver at issue on PCRA review is **statutory,** and this Court does not have the same power of negation or suspension. The presumptively constitutional legislative waiver standard is entitled to deference. Because the Majority refuses to respect the clear mandate of the PCRA statute, I do not join in its treatment of appellant's claim of ineffective assistance of counsel based on mental incompetence.

On the merits of appellant's cognizable and non-waived claim that prior counsel were ineffective for failing to litigate the question of appellant's competency to stand trial, Brief for Appellant, 42–43, I would conclude that appellant's proffer did not establish a claim of even arguable merit. Hence, I agree that appellant is not entitled to PCRA relief, albeit my conclusion is premised upon considering the claim he actually raises.

Turning to the question of "affidavits," the Majority notes that appellant supports a number of his claims by attaching unsworn "declarations" of would-be witnesses, which appellant characterizes as "affidavits" in his brief. The Majority accurately recognizes that these "affidavits" in fact are merely unsworn "declarations."

I realize that this Court has been uniformly lax in recent PCRA appeals and has appeared to accept and adopt defense characterizations of these sorts of attachments as "affidavits." But, in point of fact, these "declarations" are nothing of the sort and coming to terms with that fact should make for a more precise legal analysis in PCRA appeals. An affidavit is not self-certifying nor does it become certified by adoption once an attorney attaches it to a legal pleading. "By definition an affidavit is a statement of facts confirmed by oath before a judicial officer having authority to administer the oath." *Commonwealth v. Chandler,* 505 Pa. 113, 117–19, 477 A.2d 851, 853 (1984) (search warrant affidavit). *See also* 1 Pa.C.S. § 1991 (Affidavit is "[a] statement in writing of a fact or facts signed by the party making it, sworn to or affirmed before an officer authorized by the laws of this Commonwealth to take acknowledgments of deeds, or authorized to administer oaths, or before the particular officer or individual designated

by law as the one before whom it is to or may be taken, and officially certified to in the case of an officer under his seal of office."); *Black's Law Dictionary* (7th ed.1999), at 58 (defining affidavit as "[a] voluntary declaration of facts written down and sworn to by the declarant before an officer authorized to administer oaths"). Appellant's proffered "affidavits" in this case, including those from his former counsel, were not sworn before an officer authorized to administer an oath, they were not certified by such a qualified officer, and they bear no seal or other confirmation of certification. The statements are not even witnessed. Instead, the "affidavits" consist of "declarations" committed to paper, allegedly signed by the named declarants, and containing would-be self-certifications.[6]

I am aware that, in 1976, the definitions section of the Judicial Code adopted a more lax definition of the term "affidavit." The Code provides that, subject to additional, more specific usages, the term affidavit when used in the Code, "[i]ncludes an unsworn document containing statements of fact and a statement by the signatory that it is made subject to the penalties of 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities)." 42 Pa.C.S. § 102. Although the declarations in this case do not cite to Section 102, and appellant does not otherwise advert to a reliance upon the relaxed definition, his declarations conform to Section 102.

The PCRA, of course, is contained within the Judicial Code, but it never employs the term affidavit.[7] The term is used in this Court's Rules of Criminal Procedure governing post-conviction proceedings, see Pa.R.Crim.P. 902(D), but the Criminal Rules do not specifically define the term.[8] Since the

6. Notably, the declarations do not even state that the witnesses would be willing to repeat their allegations under oath in court.

7. The nearest the PCRA comes to addressing the substance of pleadings is in Section 9545(d), governing requests for evidentiary hearings. That provision requires that the request include "a signed certification as to each intended witness stating the witness's name, address, date of birth and substance of testimony and shall include any documents material to that witness's testimony." 42 Pa.C.S. § 9545(d) (emphasis added).

8. In contrast, the Rules of Civil Procedure have adverted to and adopted the Judicial Code's relaxed definition of affidavit. See Pa.

PCRA does not employ the term, and the Criminal Rules do not approve a "relaxed" approach to affidavits, the Section 102 definition is not implicated, and the traditional definition must govern the construction of this Court's Criminal Rules.

What makes an affidavit distinct from any other out of court statement, rumor, innuendo or falsehood is the oath and the certification. These elements are not mere formalities. The oath conveys to the declarant a sense of the very real consequences of a falsehood, including the potential for a felony perjury prosecution, 18 Pa.C.S. § 4902, while the oath and certification alike convey to the tribunal at least some level of assurance that the declarant is who he says he is, that his declaration is not fraudulent in whole or in part, and that he will be willing to stand behind his statement in court.[9] Absent such assurances, out of court witness "declarations" have little to distinguish them from other hearsay or irrelevant chatter. If the witness's statement is indeed an account that the witness will be willing to stand behind under oath in a court of law—which is the only relevant purpose for which such a statement could be proffered under the PCRA—it is a simple matter to remove the statement from the realm of rumor by having it sworn-to and certified before an appropriate officer. The fact that a witness would refuse or decline to so certify his account and subject the witness to sanctions may say volumes about its reliability. Moreover, it should be particularly easy

R.C.P. 76 (defining "affidavit" in alternative as including both traditional (sworn) definition and relaxed (unsworn) definition); id., Explanatory Comment–1981 (noting that, "[i]n 1976, Section 102 of the Judicial Code introduced the concept that an affidavit 'includes an unsworn document containing statements of fact and a statement by a [sic] signatory that it is made subject to the penalties of 18 Pa.C.S. § 4904 (relating to unsworn falsification to aurhorities).' "). Accord Rule 4006, Explanatory Comment–1981.

9. In contrast, upon reviewing the Crimes Code provisions governing falsification crimes, see 18 Pa.C.S. § 4901 et seq., it is not readily apparent whether falsehoods in unsworn and unwitnessed "declarations" such as are at issue here would be subject to prosecution. Indeed, it may well be that the form of "declaration" here was chosen because of the uncertainty as to whether a falsehood in such a declaration would expose the declarant to any significant legal consequence.

to secure a statement in affidavit form from members of the bar of this Court.

The Majority does not address the relevance or value of appellant's declarations, instead finding that, even assuming their truth, they do not warrant substantive relief or an evidentiary hearing. Like the Majority, Mr. Justice. recognizes that appellant's affidavits in fact are mere declarations and would conclude that the declarations of lead trial counsel and his associate counsel, along with other witness "affidavits" and defense proffers in this case, are enough to warrant an evidentiary hearing. Mr. Justice Nigro, on the other hand, concludes that the purported declarations of lead and associate counsel establish trial counsel's ineffectiveness as a matter of law as to one issue, thus negating the need for an evidentiary hearing and cross-examination on that question. In my view, where a contested claim for PCRA relief is premised upon the sworn affidavits of witnesses and the truth of those accounts is a necessary element to the success of the claim, the greatest relief available is the award of an evidentiary hearing. A mere affidavit cannot possibly prove the ultimate merit of a contested matter which may turn upon a faulty memory or a credibility assessment. This is so even where the putative witnesses are members of the bar: in a system of laws and not men, no witness's memory, analysis, and credibility is beyond prodding and challenge and even manipulation. Absent concession or stipulation of the material point by the Commonwealth, the most that an affidavit can demonstrate is an issue of material fact warranting an evidentiary hearing and ultimate judicial determination.

Unwitnessed and unsworn non-affidavits, such as are at issue in the case *sub judice,* are of considerably less value than sworn affidavits. In addition to being insufficient to prove the ultimate merit of a claim, it is questionable, in my view, whether such pleadings should even be deemed relevant to the question of an entitlement to a PCRA evidentiary hearing. Criminal Rule 902, which governs the content of PCRA petitions, directs that "[t]he defendant shall attach to the petition any affidavits, records, documents, or other evi-

dence **which show the facts stated** in support of the grounds for relief, or the petition shall state why they are not attached." Pa.R.Crim.P. 902(D) (emphasis added). Arguably, when the account of a witness is the basis for the "facts stated," the only sufficient proffer which could warrant an evidentiary hearing is an affidavit; unsworn declarations "show" nothing. Having said this, I nevertheless recognize that there is considerable discretionary authority vested in the PCRA trial judge to determine what sort of proffer may warrant an evidentiary hearing. Although the PCRA judge would certainly be warranted in requiring reliability in the form of a sworn affidavit, it may well be that, in an appropriate case, the court could order an evidentiary hearing based upon mere unsworn declarations and, perhaps, that course might be acceptable if the declarant is a member of the bar.

Ultimately, for purposes of decision in this case, I am prepared to assume the truth of appellant's witnesses' "declarations" (as the PCRA court did and as the Majority does) and I join in the Majority's substantive analysis, which rejects the claims dependent upon those declarations as a matter of law.

Justice EAKIN joins this concurring opinion.

Justice NIGRO, concurring and dissenting.

I agree with the majority that Appellant is not entitled to relief on any of his claims relating to the guilt phase of his trial. I note my specific agreement with the majority's treatment of Appellant's claim that he was not competent to stand trial, including its holding that a post-conviction petitioner's failure to raise a claim on direct appeal that he was incompetent at the time of trial does not constitute a waiver of that claim for purposes of the PCRA. However, unlike the majority, I believe that Appellant is entitled to relief on one of his ineffectiveness claims relating to his penalty phase.

Here, Appellant contends that his trial counsel was ineffective for failing to present certain evidence of mitigation, including evidence of Appellant's mental illness and traumatic childhood, at his penalty phase hearing and, much like Justice

Saylor, I believe that Appellant is entitled to a remand on this claim. However, unlike Justice Saylor, who would remand for an evidentiary hearing on this claim, I would find that Appellant has already demonstrated, based primarily on the statements affixed to his PCRA petition from his trial and associate counsel, that his claim of trial counsel's ineffectiveness has arguable merit, that counsel had no reasonable basis for his inactions here and that, given the circumstances of this case, he was prejudiced by counsel's deficient representation.[1] Thus, Appellant has, in my view, demonstrated that trial counsel was ineffective and there is therefore no need for the evidentiary hearing that Justice Saylor would require. Nonetheless, as Appellant has failed to adequately develop his argument that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness in this regard, I would, pursuant to this Court's decision in *Commonwealth v. McGill*, 574 Pa. 574, 590–91, 832 A.2d 1014, 1024 (2003), remand the matter to allow Appellant the opportunity to do so.

1. In his concurring opinion, Justice Castille makes much of the fact that the attorneys' statements at issue here, in which both trial counsel and associate counsel all but concede that trial counsel was ineffective at the penalty phase, were not sworn to and therefore cannot be labeled, nor carry the weight of, "affidavits." While there is no indication that the statements were notarized, I cannot agree with Justice Castille that this omission relegates the statements to a status that is more akin to "irrelevant chatter." Indeed, such an assessment lends little import to the fact that the statements were submitted by attorneys, who, unlike other lay witnesses, are bound by the Rules of Professional Conduct and who function with a unique understanding of the consequences, both criminal and disciplinary, that may result from submitting false evidence to a court. *See* Pa.R.P.C. 8.4 (it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation); 18 Pa.C.S. § 4904 (person commits misdemeanor of second degree if, with intent to mislead a public servant in performing his official function, he makes any written false statement which he does not believe to be true). And while Justice Castille insinuates that the attorneys here sought to escape these consequences by deliberately choosing the form of declaration they submitted in this case, this accusation seems unfounded in light of the Rules of Professional Conduct's general prohibition against engaging in dishonest conduct—in whatever form—and the attorneys' own certification that the information contained in their self-titled "affidavits/declarations" "is true and correct to the best of their personal knowledge, information and belief, **pursuant to 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904.**" (emphasis added).

516

Justice SAYLOR, dissenting.

I respectfully dissent, as I would remand to the PCRA court for an evidentiary hearing on the Appellant's capital, post-conviction petition. In accordance with the Post–Conviction Relief Act, Appellant provided the PCRA court with a series of declarations, including that of his trial counsel, to the effect that:

I was shocked by the jury's guilt-phase verdict and I had not done any preparation for the penalty phase of the case.... I had no strategic or tactical reason not to adequately prepare for penalty phase.

I failed to interview any witness about any aspect of Mr. Brown's mental health or upbringing. I was aware of Mr. Brown's obsession with space and space travel but it did not occur to me to consult with a mental health expert. I have reviewed the affidavits submitted in this case that chronicle Mr. Brown's history of mental problems, the abuse and neglect he received when he was young, his bipolar disorder and organic brain damage. Had I known such information, I would have presented it to the jury.... I had no strategic or tactical reason for failing to investigate, develop, or present this compelling evidence concerning Mr. Brown's background, life history, and mental illness.

Appellant also presented a corroborating declaration from an attorney who was appointed as associate counsel:

[Lead counsel] was not prepared for the fact that this was a capital case. For example, on July 2, 1991, six days before trial, he indicated to me by letter that he was not sure whether the Commonwealth was going to ask for a death-qualified jury. [Lead counsel] did no penalty phase preparation prior to the guilt-stage verdict. After the guilt-stage verdict, he urged people who were in the courtroom to testify on [Appellant's] behalf, but he did not conduct any interviews or ask anyone about [Appellant's] background. Similarly, he asked [Appellant's] girlfriend, Harriet Carter, to write down every good thing that she could think about him. He did not inquire about his background, childhood or

his mental health. There was no strategic or tactical reason not to investigate [Appellant's] history and background. Nor did [lead counsel] contact any mental health experts. There were several indications that [Appellant] was mentally ill. For example, [Appellant] was obsessed with space travel and signed his letters to me and [lead counsel] with "stardate." Similarly, in several interviews with the police, witnesses indicated that [Appellant] acted very strange. I have reviewed affidavits submitted in this case that chronicle [Appellant's] history of mental problems, the abuse and neglect he received when he was young, and his bipolar disorder and organic brain damage. Had I known of such information, I would have urged [lead counsel] to present it during the penalty phase. It would have greatly strengthened Appellant's penalty phase defense and explained to the jury the circumstances surrounding the crime. There was no strategic or tactical reason for failing to investigate, develop, or present this compelling evidence concerning [Appellant's] background, life history, and mental illness.

Further, as alluded to in the declarations of counsel, Appellant also furnished the court with an attestation from a psychiatrist to Appellant's suffering from major mental health impairments as of the time of the commission of his offenses, including bipolar disorder and organic brain damage; a report of a neuropsychologist describing impairing effects of Appellant's asserted mental health deficits in terms of his cognitive abilities and functioning; and life-history declarations from various witnesses attesting to Appellant's abandonment and abuse during his childhood.

The United States Supreme Court has made very clear that capital counsel have a duty to conduct a thorough investigation of the defendant's background in preparation for the penalty phase of trial. *See Wiggins v. Smith*, 539 U.S. 510, 546, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 1514–15, 146 L.Ed.2d 389 (2000). To the extent that a mitigation investigation is truncated, the reviewing court must determine whether the decision to curtail the inquiry was supported by reasonable profes-

sional judgment. *See Wiggins,* 539 U.S. at 523, 123 S.Ct. at 2536.

The majority appears to accept that counsel in this case may not have conducted the sort of thorough mitigation investigation that is contemplated under prevailing norms, but despite the disturbing implications of the declarations presented, it rejects the proposition that a factual inquiry is implicated. With respect to the mental health dynamic, the majority posits that "the record at the time of trial did not reveal evidence of mental illness or abuse that would have prompted trial counsel to conduct a further investigation in this regard." Majority Opinion, *op.* at 478–79, 872 A.2d at 1149. To the extent that this would be true, however, it is not dispositive, since counsel's duty to investigate was not confined to matters developed as of record. In fact, claims of ineffective assistance of counsel are most often extra-record claims; indeed, this was a primary premise of the Court's recent decision to defer them to post-conviction review so they could be properly developed on a full and complete evidentiary record. *See Commonwealth v. Grant,* 572 Pa. 48, 64, 66, 813 A.2d 726, 736–37 (2002).

Moreover, the majority's proposition is not accurate. In fact, as the majority itself notes (albeit in passing), in a 1991 pre-sentence report which was presumably available to counsel, Appellant was diagnosed as suffering from a personality disorder. *See* Majority Opinion, *op.* at 478–79, 872 A.2d at 1149. In addition to the other indicia of potential mental infirmity referenced in counsels' declarations (if believed), this should have triggered further inquiry on counsel's part. *Accord Basemore,* 560 Pa. at 292, 294–96, 744 A.2d at 735, 737–38 (finding penalty-phase counsel's awareness of unusual behavior and a mixed personality disorder on the part of his capital client important to the determination of whether further mitigation-based, mental-health investigation was warranted, and correspondingly, whether counsel's stewardship was deficient, and remanding for fact finding in this regard).[1] Most other

---

1. Even if the presentence report had not contained indicia of a personality disorder on Appellant's part, I have previously expressed my difference with the position that the existence of a pre-sentence report

courts recognize that capital sentencing jurors may place substantial weight on mental health mitigation;[2] indeed, a thorough mental-health investigation is a pillar of the American Bar Association's guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.[3]

The majority also faults Appellant for not having apprised counsel of any mental health condition. *See, e.g.,* Majority Opinion, *op.* at 478–81, 872 A.2d at 1149–50. Again, however, the focus of ineffectiveness inquiry does not rest upon the capital defendant, but rather, on the reasonableness of the pre-trial investigation conducted by counsel. *See Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 2536, 156 L.Ed.2d

prepared at the instance of the government obviates further mitigation investigation on the part of capital, penalty-phase counsel. *See Commonwealth v. Fears,* 575 Pa. 281, 319–20, 836 A.2d 52, 75 (2003) (Saylor, J., concurring); *accord Averhart v. State,* 614 N.E.2d 924, 930 (Ind.1993) (finding capital counsel ineffective, *inter alia,* for naively placing undue emphasis on the contents of a pre-sentence report in terms of the production of his own case for mitigation).

**2.** *See, e.g., Allen v. Woodford,* 366 F.3d 823, 850–51 (9th Cir.2004) ("Defense counsel's use of mitigation evidence to complete, deepen, or contextualize the picture of the defendant presented by the prosecution can be crucial[.]"); *United States v. Barnette,* 211 F.3d 803, 825 (4th Cir.2000) (stating that "psychiatric evidence is an important part of many trials"); *Baxter v. Thomas,* 45 F.3d 1501, 1515 (11th Cir.1995) ("[p]sychiatric mitigating evidence 'has the potential to totally change the evidentiary picture'") (quoting *Middleton v. Dugger,* 849 F.2d 491, 495 (11th Cir.1988)); *People v. Coleman,* 168 Ill.2d 509, 214 Ill.Dec. 212, 660 N.E.2d 919, 934 (1995) ("We acknowledge the critical importance of a defendant's background and mental health to the sentencing decision.").

**3.** *See generally* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 4.1, commentary (rev. ed. Feb.2004) (observing that "mental health issues are so ubiquitous in capital representation that the provision of resources in that area should be routine"); *id.* 214 Ill.Dec. 212, 660 N.E.2d 919, commentary ("In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row."); *id.* (observing that "the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase[;] ... [c]ounsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination.").

471 (2003); *Commonwealth v. Malloy*, 579 Pa. 425, 459, 856 A.2d 767, 788 (2004) ("The onus is not upon a criminal defendant to identify what types of evidence may be relevant and require development and pursuit. Counsel's duty is to discovery such evidence through his own efforts, including pointed questioning of his client."); *Commonwealth v. Basemore*, 560 Pa. 258, 290, 744 A.2d 717, 735 (2000) ("Obviously, ... different light falls upon counsel's performance depending upon whether he asked and was not told, or he did not ask and therefore was not told."). The relevant question simply cannot be answered without exploring, *inter alia*, what avenues counsel pursued to develop mitigation evidence, including what questions counsel asked of his client.[4]

The majority also offers a brief assessment concerning the prejudice prong of the ineffectiveness inquiry that affords no express comparison between the evidence presented at the penalty phase of trial and that which Appellant seeks to develop on post-conviction review that, and thus, lacks a reasoned accounting for the qualitative aspect of the capital sentencing process. *Compare* Majority Opinion, *op.* at 479–82, 872 A.2d at 1150–51 (reasoning that Appellant was not prejudiced by trial counsel's performance during the penalty phase because "the jury found the mitigating circumstance that Appellant acted under extreme mental or emotional disturbance and the catchall mitigating circumstance of other evidence of mitigation."), *with Commonwealth v. Brown*, 538 Pa. 410, 429, 648 A.2d 1177, 1186 (1994) (explaining that the

4. In defense of its apparent position that it is not necessary to explore what avenues counsel pursued, the majority cites *Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935 (2001), and *Commonwealth v. Uderra*, 550 Pa. 389, 706 A.2d 334 (1998). Both decisions, however, predate the United States Supreme Court's definitive clarification concerning the essential focus on counsel's investigation in *Wiggins*, 539 U.S. at 522–24, 123 S.Ct. at 2536, which was followed by this Court in *Malloy*, 579 Pa. at 461–62, 856 A.2d at 789. The majority's efforts to distinguish *Malloy* on the facts, *see* Majority Opinion, *op.* at 481–82 n. 9, 872 A.2d at 1151 n. 9, do not speak to the straightforward legal proposition for which I have cited it, above.

It is also noteworthy that in both of the cases cited by the majority, *Uderra* and *Bracey*, the defendant was afforded an evidentiary hearing on the penalty-phase ineffectiveness claim, which is the sole relief that I would presently award.

weight of the evidence presented, and not the ability to "count" any particular mitigator, is the dispositive factor in the death penalty statute's qualitative approach to the selection in capital sentencing). Again, other jurisdictions recognize the potential that the sort of mental-health mitigation that Appellant has proffered was omitted from his trial by virtue of his counsel's inadequate preparation may be deemed by jurors to be of substantial weight in the sentencing equation. *See supra* notes 2 and 3. Indeed, some have done so by way of explicit contrast to the sort of generalized "humanizing" evidence alluded to by the majority. *Compare* Majority Opinion, *op.* at 479–82, 872 A.2d at 1150–51 (relying upon trial counsel's having offered mitigation evidence portraying Appellant as a "caring friend and neighbor" to foreclose a hearing concerning Appellant's post-conviction proffer of evidence of major mental health illness), *with Allen,* 366 F.3d at 850–51 (explaining the substantial difference between generalized "humanizing" evidence and evidence which tends to explain or afford some context to the defendant's criminal behavior—"the mitigation evidence proffered by [the defendant], which consisted primarily of testimony that at some points in his life [the defendant] had been nice to some people and that some people cared for him, is not of the same 'quantity and quality' as that which supported our decision in *Mayfield*[, 270 F.3d 915 (C.A.9, 2001)] [, a case involving, *inter alia,* substantial life-history and mental-health related mitigation], and could not have 'humanized' him during the time frame of the murder conspiracy at issue."); *id.* ("We have rarely granted habeas relief based solely upon humanizing, rather than explanatory, mitigation evidence in the face of extensive aggravating circumstances). Moreover, and again, the majority's failure in its prejudice assessment to engage in any explicit comparison of the penalty-phase presentation with that which is offered on post-conviction review is contrary to precedent. *See, e.g., Malloy,* 579 Pa. at 461, 856 A.2d at 789 (explaining that "in considering whether appellant was prejudiced we must consider not only the evidence and argument presented at the penalty phase, but also the evidence and argument that **would**

**have been** presented at the penalty hearing had trial counsel properly investigated such evidence" (emphasis in original)).[5]

Finally, the majority would simply accept the PCRA court's credibility determination (made without the benefit of hearing the witnesses) that counsels' concessions of unpreparedness are untrue, because counsel offered testimony from eight mitigation witnesses at the penalty phase of trial. *See* Majority Opinion, *op.* at 481–82 n. 9, 872 A.2d at 1151 n. 9. An examination of the actual penalty-phase mitigation testimony, however, covering a relatively brief 30 pages of transcript, supports rather than contradicts counsels' declarations. The first witness called was a detective who had testified in the Commonwealth's case-in-chief (and thus was immediately available to counsel), and the testimony proceeded as follows:

Q: Good morning again, Detective.

A. Good morning.

Q. *I stopped you very briefly out in the hall a few moments ago, did I not?*

A. Yes.

Q. I asked you a question, did I not?

A. Yes.

Q. Repeating that question, since that incident back in 1967 where Mr. Brown pled guilty to voluntary manslaughter and conspiracy, according to your records, has he been arrested or convicted of any crimes since that date?

---

5. To the extent that the majority's prejudice analysis is predicated on the assertion that Appellant has failed to proffer that evidence of mental infirmity existed at the time of trial, *see* Majority Opinion, *op.* at 479–82, 872 A.2d at 1150–51, it overlooks the pre-existing diagnosis of a personality disorder, the unusual behavior relative to space travel, and the attestations of the defense psychiatrist to the effect that his diagnosis of long-standing major mental health disorder is confirmed by the historical information. *See, e.g.,* Declaration of Richard Dudley, Jr., at ¶ 6 ("Mr. Brown's life history, as presented in the collateral information, confirms my view that Mr. Brown suffered from these deficits for much of his lifetime.").

523

A: Since the date of 1967, our records in the city of Philadelphia show that he has not been arrested in the city.

[Counsel]: Thank you very much.

N.T., Jul. 24, 1990.

The next witness was Appellant's girlfriend, Harriet Carter, and her testimony opened as follows:

Q. I telephoned you *last evening,* did I not?

A. Yes.

Q. I told you over the telephone what the verdict was in this case?

A. Yes.

\* \* \*

Q. I asked you to do something for me *last night,* did I not?

A. Yes.

Q. What did I ask you to do?

A. You asked me to write down everything good about John Brown.

N.T., July 24, 1991, at 1032–33 (emphasis added). The bulk of the remainder of the Ms. Carter's direct testimony (covering five pages of the transcript) consists of her reading the statement that she had prepared the previous evening. *See* id. at 1034–36. The remaining witnesses appear to have been persons Ms. Carter was able to summon to the courtroom, including her children Robert (whose testimony covers approximately 4 pages of transcript), Angela (2 pages), and April (2 pages); Ms. Carter's brother (3 pages); Ms. Carter's sister (1 page); and a friend of Ms. Carter's (2 pages).[6] Counsel's post-conviction attestation that he was shocked by the guilt-phase verdict is also confirmed in the penalty-phase record, as he related this to the jury in his closing argument. *See* N.T., July 24, 1991, at 1075 ("and of course you saw the look of

6. The only other witness was Appellant's sister, who had testified as a Commonwealth witness in the guilt phase of trial.

shock and surprise on my face when you announced your verdict").

Thus, the record does not support the characterization of the attorneys' post-conviction declarations as misrepresentations, but rather, strongly corroborates the declarations. Counsel's presentation of the case for life imprisonment over death contains none of the deeper, explanatory-type evidence that would require an actual investigation and which Appellant now seeks to demonstrate was available to counsel, had he performed reasonably. Rather, it is precisely of the sort that could have been fashioned immediately before the penalty phase, as counsel have attested was the case and as the record supports.

It remains my position that, in circumstances (such as here) in which affidavits, declarations, or similar evidentiary proffers are presented to a PCRA court which, if believed, would bring the reliability of the death verdict into legitimate question, a post-conviction hearing and associated fact-finding are required. *See* Pa.R.Crim.P. 909(2) (authorizing dismissal of a PCRA petition only where there are no material facts in issue, and no relief is available as a matter of law).[7] Under the clear import of the rules, and in light of the above perspective, the assessment concerning counsels' truthfulness in conceding deficient stewardship in terms of penalty-phase preparation, as well as the credibility and weight of Appellant's post-conviction proffer of mitigating evidence, should be made based on an evidentiary record.

I also note my disagreement with several other aspects of the majority's articulation and application of relevant legal precepts controlling the treatment of Appellant's claims. For example, the majority suggests a very broad application of the previous litigation doctrine to bar Appellant's claim that his trial and direct appeal counsel were ineffective for failing to

7. In addition, summary disposition of Appellant's post-conviction petition was also procedurally inappropriate here, as the record does not reflect that Appellant was furnished pre-dismissal notice of the reasons why the court was denying a hearing, as is required by Criminal Procedural Rule 909(B)(2)(a).

challenge the legal availability of the sole aggravator on grounds of statutory construction, based on the Court's disposition on direct appeal of a claim of prosecutorial misconduct in the Commonwealth's underlying evidentiary presentation. *See* Majority Opinion, *op.* at 470–73, 872 A.2d at 1144–45 (citing *Commonwealth v. Brown*, 538 Pa. 410, 427–28, 648 A.2d 1177, 1185 (1994)). Apparently not fully comfortable with this application of previous litigation, the majority alternatively invokes the doctrine of waiver, based on the claim not having been raised on direct appeal. *See id.* at 471–73, 872 A.2d at 1145. This, however, simply overlooks Appellant's separate assertion of ineffective assistance on the part of his direct-appeal counsel in failing to raise and preserve the claim; [8] but it is well settled that if such a separate claim is proved, it may be relied upon to overcome waiver of an underlying claim. *See, e.g., Commonwealth v. McGill*, 574 Pa. 574, 586–87, 832 A.2d 1014, 1021–22 (2003). While the majority might fault Appellant's present counsel for insufficiently developing such ineffectiveness claim, this Court has acknowledged the shortcomings of the jurisprudence that prevailed during the time frame in which this case was briefed, *see id.* at 584, 832 A.2d at 1020, and thus determined that the proper treatment of claims along these lines is not outright rejection on grounds of waiver, but rather, a remand for adequate development of the claim in accordance with the framework articulated in *McGill. See id.* at 591, 832 A.2d at 1024.[9]

The majority also articulates the exception to *McGill's* remand rule by indicating that a petitioner must have pled, presented, and proved his underlying claim in order to be eligible for the remand. *See* Majority Opinion, *op.* at 475–78, 872 A.2d at 1147–48. *McGill*, however, does not require actual proof of the claim as a prerequisite to a mere remand in

---

8. *Compare, e.g.,* Majority Opinion, *op.* at 471–73, 872 A.2d at 1145 (finding Appellant's challenge to the jury's finding of the (d)(12) aggravator waived "due to Appellant's failure to raise it on direct appeal"), *with* Brief of Appellant, at 16 ("All prior counsel were ineffective for failing to properly litigate this claim.").

9. Such remand, of course, might be avoided by merely addressing the underlying merits of Appellant's statutory construction claim.

all circumstances—to the contrary, it states a general preference in favor of remand, and the logical and fair import of the exception that it recognizes is that it should apply only in circumstances in which the underlying claim is facially defective or capable of being deemed meritless on the state of the record presented. *See McGill*, 574 Pa. at 591–92, 832 A.2d at 1024–25. Indeed, in circumstances where (as here) the petitioner has been afforded no opportunity to prove his claims,[10] as he was denied a post-conviction hearing, it is manifestly unfair to suggest that the availability of a *McGill* remand should depend upon some failure of the petitioner's proofs.

10. The majority controverts the observation that Appellant was denied an opportunity to prove his claim in this case, via reference to the PCRA court's having conducted "hearings solely to determine whether an evidentiary hearing was required." *See* Majority Opinion, *op.* at 481–82 n. 9, 872 A.2d at 1151 n. 9. I fail to see, however, how characterizing oral argument on a Commonwealth motion to dismiss as a "hearing" alters the fact that Appellant was not afforded the opportunity to create an evidentiary record pursuant to Criminal Procedural Rule 909(B).